# Illinois Official Reports

## Appellate Court

***People v. Mefford*, 2015 IL App (4th) 130471**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSHUA J. MEFFORD, Defendant-Appellant. |
| District & No. | Fourth District Docket No. 4-13-0471 |
| Filed | December 3, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Coles County, No. 12-CF-335; the Hon. Mitchell K. Shick, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Rebecca I. Levy (argued), all of State Appellate Defender's Office, of Springfield, for appellant. Brian Bower, State's Attorney, of Charleston (Patrick Delfino, David J. Robinson, and Kathy Shepard (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion. Justices Knecht and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a trial that ended in May 2013, a jury found defendant, Joshua J. Mefford, guilty of (1) first degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and (2) robbery (720 ILCS 5/18-1(a) (West 2010)). Specifically, the jury determined that the State proved beyond a reasonable doubt that defendant struck another person, Robert Montague, knowing that such an act created a strong probability of death or great bodily harm and, thereafter, robbed Montague of cash. In June 2013, the trial court sentenced defendant to consecutive prison terms of (1) 36 years for first degree murder and (2) 5 years for robbery.

¶ 2      Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt of first degree murder, (2) the trial court erred by failing to (a) ensure the jury was properly instructed and (b) prevent the jury from considering impermissible other crimes evidence, and (3) he was deprived of the effective assistance of trial counsel. For the reasons that follow, we affirm.

¶ 3                        I. BACKGROUND

¶ 4      In September 2012, the State charged defendant with (1) one count of first degree murder (knowing) (720 ILCS 5/9-1(a)(2) (West 2010)) (count I), (2) one count of first degree murder (felony) (720 ILCS 5/9-1(a)(3) (West 2010)) (count II), and (3) robbery (720 ILCS 5/18-1(a) (West 2010)) (count III).

¶ 5             A. The Evidence Presented at Defendant's Trial

¶ 6      At defendant's jury trial, which occurred during April and May 2013, the parties presented the following evidence.

¶ 7                   1. *The State's Evidence*

¶ 8      Mitchell Estep testified that from 2006 to 2012, he was a resident at the U.S. Grant motel (motel) in Mattoon, Illinois. During those years, Estep and Montague, another long-term resident of the motel, became close friends. Eventually, Montague became a motel employee. Estep explained that when the motel's owners would travel, Montague would rent rooms and receive payments, which he kept in a "blue money bag."

¶ 9      On the afternoon of September 8, 2012, Estep waved to Montague, who was standing in front of the motel office talking to the motel owners before their planned trip. When Montague waved back, Estep–who estimated he was 70 feet away–did not notice anything unusual about Montague's face. The next day, at about 10:30 a.m., Estep went to Montague's room and noticed that his door was locked, which was unusual. After Estep's knocks went unanswered, another tenant manipulated the door lock and entered Montague's room, as did Estep. Estep then saw Montague, who "[l]ooked like he'd been beaten with a ball bat," lying face up on the floor.

¶ 10      Dennis Camfield, a Mattoon fire department emergency medical technician, testified that on September 9, 2012, he responded to a request for assistance at the motel. Camfield saw Montague lying faceup on the motel room floor, with (1) dark "bluish-purple" discoloration of both eyes, (2) blood coming from his nose, and (3) pooling blood on the back side of his head.

Camfield stated that Montague's injuries were indicators of a skull fracture. Camfield opined that it would have taken "significant trauma" to cause Montague's injuries.

¶ 11    Amanda Youmans, a board-certified forensic pathologist, testified that she performed Montague's autopsy by first conducting a comprehensive external examination of his nude body. Youmans documented that Montague was "a very thin, frail man," who was 58 years old; 5 feet, 3 inches tall; and weighed 93 pounds. Youmans testified that Montague had the following external injuries: (1) bruising to the area around both eyes; (2) abrasions to his forehead, left temple, and chin; (3) a laceration that went through his upper lip; (4) lacerations to his lower lip; (5) the absence of two bottom teeth; (6) the displacement of the nose to the right, which was "consistent with trauma being inflicted to the left side of the nose"; (7) a laceration and bruise to the back of [his] head; (8) bruising on Montague's lower-back and upper-buttocks area, which was consistent with a backward fall; and (9) multiple contusions on the inner surface of the left arm, which indicated defensive injuries.

¶ 12    Youmans' internal examination revealed that Montague had a "hematoma," which she described was a "significant amount of clotted blood," on the right side of his head just under the scalp. After removing the blood, Youmans discovered skull fractures underlying the hematoma. Youmans' examination also revealed (1) "a lot of blood accumulation" and bruising over the right side of Montague's brain, (2) further skull fractures on the interior of Montague's skull, and (3) a skull fracture behind Montague's right eye caused by blunt force trauma.

¶ 13    Youmans explained that the blunt force trauma Montague suffered caused bleeding over and into the brain, which resulted in brain swelling. The increased pressure of a swelling brain confined within a skull–if left untreated–can cause a person to lapse into a coma and eventually cause death. Youmans opined to a "reasonable degree of professional certainty" that (1) Montague's internal and external injuries occurred about 12 hours before his death, (2) the cause of Montague's death was blunt force head trauma, (3) Montague received at least six blunt force trauma blows to the front of his face, (4) a head injury Montague suffered to the back of his skull was consistent with a "fall backward onto concrete," and (5) with the exception of the trauma to the back of Montague's skull, his remaining injuries were consistent with strikes from a fist. Youmans clarified that the six blunt force trauma blows to Montague's face did not include the blunt force trauma Montague sustained to the back of his head by falling backward onto concrete. Toxicology testing revealed that Montague had a blood alcohol content of 0.06.

¶ 14    John McCain, a crime scene investigation supervisor with the Mattoon police department, testified about the method and manner he and a fellow police officer used to process the motel crime scene, which occurred during a continuous 10-hour period. McCain noted that behind the motel's office, he recovered (1) samples of several red stains and (2) two human teeth. McCain also recovered samples of red stains in the motel office, which led into the motel's bathroom. Based on his training and experience, McCain surmised that the red stains were human blood. During the investigation, police found (1) a blue money bag and (2) a set of motel keys wedged in the bed of a pickup truck, which was parked at the motel. McCain acknowledged that he did not find a trail of red stains from the office to Montague's room.

¶ 15    Forensic deoxyribonucleic acid testing performed by the Illinois State Police Springfield forensic science laboratory revealed that the samples police recovered from the red stains in (1)

the motel office, (2) the sidewalk on the east side of the motel office, and (3) the motel office restroom area were Montague's blood.

¶ 16 Mattoon police detective Sam Gaines testified that he investigated Montague's death with the lead detective, Jeremy Clark. On September 9, 2012, Gaines received information regarding Montague from William Clodfelder, a long-term resident of the motel. (Clodfelder has since died.) Based on that information, Gaines and Clark located defendant in Windsor, Illinois. Thereafter, defendant agreed to an interview at the Mattoon police department regarding Montague's death. (A recording of the interview Clark conducted with defendant was played in its entirety for the jury.)

¶ 17 The recording showed that on September 9, 2012, at 6:36 p.m., defendant and Clark entered the interview room. Clark then asked defendant to empty his pockets. Defendant produced a lighter and $27, which Clark confiscated. During the interview, defendant–who was 25 years old–stated that on the previous night, he was drinking beers in Clodfelder's motel room. At about 10:30 p.m., defendant left and walked "around" the motel's property to "clear his head." Defendant characterized his demeanor as not "falling over drunk" but, instead, he "had a good buzz going." Shortly thereafter, defendant encountered Montague–whom he had known since childhood–by the motel's front office. Defendant stated that as he approached, Montague mistook him for a person who had assaulted Montague weeks earlier. Montague, who defendant stated was very drunk, became aggressive.

¶ 18 After defendant identified himself, Montague calmed down and they began a conversation. However, defendant stated that "something clicked in [Montague's] head," and he became aggressive again. As the confrontation escalated, defendant admitted that he overreacted and punched Montague once on the left side of his jaw, which caused Montague to fall "straight back, [landing] on his back with his hands up above his head." After striking Montague, defendant stated that he "just walked away."

¶ 19 Immediately thereafter, Clark expressed concern that defendant was not revealing the full extent of his involvement. Specifically, Clark told defendant, "[w]e need to talk about the money bag." At first, defendant denied any knowledge, responding, "I don't know *** anything about it." Eventually, defendant acknowledged that (1) he had taken a blue money bag after Montague fell to the ground and (2) the bag contained $27, which Clark had earlier confiscated. Defendant asserted that although he did not intend to rob Montague, he took the money because he was "always broke." Defendant could not remember what happened to the money bag after he took the $27, stating, "[t]hat part of the night is blank." Defendant denied knowledge of any motel room keys.

¶ 20 As defendant returned to Clodfelder's room, he met Clodfelder just outside the doorway. Clodfelder told defendant that he was returning from a fast-food restaurant and saw the "whole incident." Specifically, that defendant knocked Montague out and took the money bag. Later that evening, a mutual friend–whom defendant identified as Will–visited Clodfelder. Defendant told Will and Clodfelder about the altercation between defendant and Montague. A "couple of hours later," defendant walked to the front office, but did not see Montague. Instead, defendant found blood spots and two teeth. Defendant later left the motel.

¶ 21 After a brief interview break, Clark returned and sought to clarify how many times defendant punched Montague. Defendant responded as follows:

> "No, I hit [Montague] one time and he went out. I mean, I, I've fought a lot growing
> up. Don't get me wrong, *** I'm pretty good with my hands and I know I've got a hard

- 4 -

punch. But, *** very rarely do I hit a guy and keep continually hitting him when he is out."

¶ 22    At one point toward the end of the interview, Clark stated to defendant, "Well, obviously [Montague] has passed away," which prompted the following response:

"Yeah. *** [T]hat's the one thing that doesn't make sense to me. [It's] like [Montague] got up and moved from there, you know what I mean[?] So, he was alright. Like what was the cause of death? Did he choke on blood[?] Did he, you know[?]"

¶ 23    Clark also testified that text messages retrieved from defendant's cell phone showed that from 5:40 p.m. to 6:11 p.m. on September 9, 2012–approximately one hour before police interviewed him–defendant received numerous text messages from various people warning him that the police suspected he was involved in Montague's death.

¶ 24    Brandon Saunders, a patrol officer with the Mattoon police department, testified that following defendant's arrest, he booked defendant into the Coles County jail. During that process, defendant told Saunders he thought that he left the money bag "between the cab of the pickup truck and the toolbox of a pickup truck that was parked at the [motel]." Saunders also did not notice any jewelry or tattoos on defendant's hands.

¶ 25    Nathan Burton, a deputy sheriff assigned to the Coles County detention center, testified that part of his duties concerned monitoring the flow of nonlegal mail out of and into the Coles County jail. Burton explained that this process included reading letters sent to and from inmates to ensure safety and security. On October 8, 2012, Burton intercepted a letter written by defendant, which stated, in pertinent part, the following:

"Amber,

Hello *** how are you doing? My name is Josh. I'm currently in the Coles County jail. Just an FYI, they got me in here for murder in the first-degree, but it's going to be dropped down. I can't really explain all the details. Long story short, I punched a guy in the face. He fell back, cracked his head on the sidewalk and died 5 hours later. Not my fault. Anyway, let me tell you about myself. I'm 6 [feet] 3 [inches], well built, white boy, (or guero) as your brother calls me. I weigh 200 lbs, short hair, and blue eyes. Got a couple tattoos, 7 all together [*sic*], and planning on getting more.

* * *

Thanks for listening,
[Defendant]"

(The record shows that Amber is the sister of defendant's friend.)

¶ 26    James Drew testified that on September 8, 2012, he was working at the Castle Inn Lounge Bar & Grill (bar), which is next door to the motel. Sometime between 10:30 p.m. and 11 p.m., as Drew was checking identification at the front entrance, defendant entered the bar. Drew explained that although defendant did not present identification, he knew defendant was of legal age to drink alcohol. Shortly thereafter, another employee accompanied defendant out of the bar and told Drew that defendant was not allowed in because he did not have identification. About 20 minutes later, Drew saw defendant drinking a beer at the bar's outside smoking area. Defendant complied with Drew's request to leave the property. Drew confirmed that the bar had a video surveillance system that monitored the bar's (1) front door, (2) bar area, and (3) smoking area. (A video recording, showing excerpts of defendant's presence at the aforementioned locations was then shown to the jury.)

¶ 27       Shauna Kemper testified that on September 8, 2012, at 9 p.m., she was with family and friends in the bar's smoking area when she was approached by defendant sometime between 9:30 and 10 p.m. Kemper knew defendant through her brother-in-law. Kemper described defendant's demeanor as anxiety-ridden in that he was "bouncing around the place." Defendant offered to buy Kemper and her husband a beer if they agreed to buy him one also, explaining that he did not have any identification. Kemper's husband complied. Thereafter, Kemper recalled that defendant bought drinks for others.

¶ 28       Will Engel, Clodfelder's close friend, testified that sometime during the evening of September 8, 2012, Clodfelder entered the home he shared with his mother and told Engel that he had "seen [defendant] hit the night manager at the [motel]." Thereafter, Engel accompanied Clodfelder to his motel room, where defendant was located. When Clodfelder confronted defendant with what he saw, defendant admitted that he hit Montague, but defendant did not elaborate further. Defendant later told Engel that he "had some extra money" and offered to buy drinks, but Engel declined.

¶ 29       Chad Moran, a convicted felon who was then an inmate at the Coles County jail awaiting trial, testified in detail concerning a guilty-plea agreement he had with the State. Specifically, that the State would (1) make certain sentencing recommendations and (2) dismiss other charges in exchange for his truthful testimony concerning defendant's case. (The trial court (1) informed the jury of Moran's numerous prior convictions and (2) admonished the jury that Moran's prior convictions could be considered only as they related to his credibility.)

¶ 30       Moran testified further that as a result of criminal activity, he was arrested and transported to the Coles County jail, where he had been since December 2012. Upon his arrival, Moran was defendant's cellmate until approximately February 2013. During that time, Moran and defendant shared various aspects of their respective cases. Moran then provided the following account of what occurred on the evening of September 8, 2012, as described by defendant.

¶ 31       Defendant was having a conversation with Montague, when Montague stated, "You young people have no respect." Thereafter, defendant punched Montague in the face, which caused Montague to fall to the ground. Defendant then punched Montague a second time, "to make sure that *** there was no resistance." Defendant then took the money from the cash bag before discarding it. Defendant's explanation for his acts was that "he had an argument with his girlfriend *** and *** he wanted to go get drunk and do some things." Defendant stated that he knew Montague had money because he likely received his governmental benefits on the first of the month. Defendant then went to a local bar, had a couple of drinks, and traveled to Windsor for dinner at the home of his girlfriend's parents. Defendant also told Moran that Clodfelder saw him punch Montague a second time. Defendant's planned defense to that allegation was that Clodfelder was mistaken in that defendant was reaching to get the money bag.

¶ 32       Moran explained that inmates have a "hierarchy of criminals" among them. Violent criminals–that is, those who are physical or aggressive–have a higher stature than, for example, sex offenders, who are considered to be at the bottom of the hierarchy. Some inmates display "bragging rights" with tattoos that symbolize certain crimes. Moran stated that he tattooed "IXIXXII" on defendant's right hand, which symbolized the date September 9, 2012–the date of Montague's death. Moran stated that the tattoo was placed on defendant's right hand to symbolize the weapon used to kill Montague. (A photograph of the tattoo was

shown to the jury.)

¶ 33                                  2. *Defendant's Evidence*

¶ 34     Jessica Lovell testified that from September to November 2012, she resided at the motel. During that time, she befriended Montague, who lived three or four doors from her room. Lovell admitted consuming alcohol "about every day" and would frequently get intoxicated with Montague. Throughout the day, on September 8, 2012, Lovell and Montague were at Montague's room drinking beer and "maybe a little bit of whiskey." Lovell left Montague's room at approximately 10 p.m. and returned to her room to sleep.

¶ 35     During the early morning hours of September 9, 2012, Lovell returned to Montague's room, which was unlocked. At that time, Lovell admitted she was significantly impaired. Lovell woke Montague, started a conversation, and began drinking a beer from Montague's cooler. Montague told Lovell that he had a migraine headache. Lovell gave Montague a beer but after one sip, Montague complained that the beer "was burning his lips," which Lovell noticed were bleeding. Lovell stayed in Montague's room until about 5 a.m. When Lovell left, she remembered leaving the door slightly open.

¶ 36     At 9 a.m. that day, Lovell was walking to the motel office to get ice when she noticed Montague's hat on the sidewalk. Lovell attempted to return the hat, but Montague's room was locked. Lovell placed the hat on a chair next to Montague's room door.

¶ 37                    B. The Jury's Verdict and the Trial Court's Sentence

¶ 38     Following deliberations, the jury found defendant (1) guilty of (a) first degree murder (knowing) (count I) and (b) robbery (count III) and (2) not guilty of murder (felony) (count II). The trial court later sentenced defendant to consecutive prison terms of (1) 36 years on count I and (2) 5 years on count III.

¶ 39     This appeal followed.

¶ 40                                      II. ANALYSIS

¶ 41                               A. Sufficiency of the Evidence

¶ 42     Defendant argues that the State failed to prove his guilt beyond a reasonable doubt of first degree murder. We disagree.

¶ 43              1. *The Applicable Statutory Provisions and the Standard of Review*

¶ 44     Section 9-1(a)(2) of the Criminal Code of 1961–one of the statutory provisions under which defendant was convicted–provides, as follows:

         "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
              ***
              (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(2) (West 2010).

¶ 45     When reviewing a challenge to the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v.*

*Phillips*, 2014 IL App (4th) 120695, ¶ 19, 14 N.E.3d 1. In so doing, we allow all reasonable inferences from the record in favor of the State. *People v. Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d 319, 323 (2011). "The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence." *People v. Burney*, 2011 IL App (4th) 100343, ¶ 25, 963 N.E.2d 430. "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217, 824 N.E.2d 262, 267-68 (2005).

¶ 46                            2. *Defendant's Claim*

¶ 47        In support of his argument, defendant contends that the State failed to prove that he had the requisite *mens rea* to sustain a first degree murder conviction–that is, that defendant "knew his actions were 'practically certain' to cause *** Montague's death or great bodily harm." Defendant asserts, instead, that the State's evidence established that he "acted recklessly" and was "not consciously aware of the risk of death." Based on this claim, defendant urges this court to reduce his first degree murder conviction to involuntary manslaughter (720 ILCS 5/9-3(a) (West 2010)). We decline to do so.

¶ 48        "The difference between involuntary manslaughter and first degree murder lies in the mental state that accompanies the conduct resulting in the victim's death." *People v. Robinson*, 232 Ill. 2d 98, 105, 902 N.E.2d 622, 625-26 (2008). "A defendant commits involuntary manslaughter when, without lawful justification, he unintentionally kills an individual by recklessly performing acts that are likely to cause death or great bodily harm." *People v. Castillo*, 188 Ill. 2d 536, 540, 723 N.E.2d 274, 277 (1999); see 720 ILCS 5/9-3(a) (West 2010) (providing the statutory definition of involuntary manslaughter). A person is reckless or acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to another. *Castillo*, 188 Ill. 2d at 540-41, 723 N.E.2d at 277; 720 ILCS 5/4-6 (West 2010). Because involuntary manslaughter requires a less culpable mental state than first degree murder, it is a lesser-included offense of first degree murder. *Robinson*, 232 Ill. 2d at 105, 902 N.E.2d at 626.

¶ 49        Defendant posits that the evidence presented in this case supported a conviction for involuntary manslaughter instead of first degree murder. In support of his theory, that he acted recklessly at the time of Montague's murder, defendant directs our attention to his (1) intoxication at the time he punched Montague; (2) testimony that he punched Montague once, which he claims was corroborated through testimony provided by Engel and Moran; and (3) disbelief during the police interview that his actions would cause Montague's death.

¶ 50        As we have previously noted, however, our review concerns whether after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Phillips*, 2014 IL App (4th) 120695, ¶ 19, 14 N.E.3d 1. The paramount issue before us is whether defendant had the requisite mental state to sustain a first degree murder conviction. Based on the evidence presented, no reason exists to disturb the jury's verdict.

¶ 51        In this case, the undisputed testimony provided by Youmans directly contradicts defendant's assertion that he punched Montague once in a reckless manner. During Montague's autopsy, Youmans (1) conducted a thorough external and internal examination of his body; (2) documented the number and severity of defendant's injuries; and (3) opined to a

reasonable degree of medical certainty that based on his injuries, Montague suffered at least six blunt force trauma blows to his face, which were consistent with strikes from a fist. Youmans provided the jury a visual and descriptive account of the traumatic effect the six blunt force blows had on the following portions of Montague's face: (1) to the right side of the forehead, (2) around the right eye, (3) around the left eye, (4) a skin tear through the upper lip, (5) two lacerations to the lower lip, and (6) a right displacement of the nose. In addition, Youmans revealed that Montague had multiple contusions on the inner surface of the left arm, which indicated defensive injuries.

¶ 52    Based on the aforementioned evidence presented, the jury could reasonably have concluded that sometime during his violent encounter with Montague, defendant–who was substantially younger, stood one foot taller, was at least 100 pounds heavier, and boasted of his "hard punch"–knew that the multiple blunt force blows he inflicted on Montague "created a strong probability of death or great bodily harm." Based on our standard of review, we decline to disturb the jury's verdict.

¶ 53    We find defendant's reliance on *People v. Jones*, 404 Ill. App. 3d 734, 936 N.E.2d 1160 (2010), unpersuasive. In *Jones*, the victim died of asphyxiation as a direct result of the defendant placing his foot between the victim's neck and chest, which was observed by an independent witness. *Id.* at 737-38, 936 N.E.2d at 1164. Following a bench trial, the trial court found the defendant guilty of first degree murder and, thereafter, sentenced him to 22 years in prison. *Id.* at 741, 936 N.E.2d at 1167. In reducing the defendant's first degree murder conviction to involuntary manslaughter and remanding for resentencing, the *Jones* court concluded, as follows:

> "The evidence presented at trial does not support an inference that a layperson such as defendant knew or should have known that applying 4.4 pounds of pressure for at least one minute was sufficient to cause [the victim] to asphyxiate or that this pressure need not have been applied directly to the jugular vein but instead could have been applied to the soft tissue on the front or side of the neck. In addition, there is nothing in the record to suggest that defendant was aware of the various degrees of pressure that, when applied to certain parts of a person's body, will cause that person to asphyxiate." *Id.* at 747, 936 N.E.2d at 1172.

Here, no such specialized physiological knowledge was required to know that at least six blunt force blows to an individual's face would likely result in great bodily harm or death. Accordingly, we conclude that ample evidence was presented for the jury to reasonably conclude that defendant committed first degree murder.

¶ 54    In so concluding, we note this court's decision in *People v. Willett*, 2015 IL App (4th) 130702, ¶¶ 1-2, 37 N.E.3d 469, in which we reversed the defendant's conviction for aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2010)) and remanded for a new trial based, in part, on the trial court's refusal to instruct the jury on the lesser-included offense of reckless conduct (720 ILCS 5/12-5 (West 2010)). Specifically, we held that when "some evidence" is presented showing a defendant acted recklessly and not knowingly, a trial court should instruct the jury on the lesser-included offense of reckless conduct. *Willett*, 2015 IL App (4th) 130702 ¶¶ 90-91, 37 N.E.3d 469.

¶ 55    Unlike *Willett*, the trial court in the instant case properly instructed the jury on (1) the lesser-included offense of involuntary manslaughter (see Illinois Pattern Jury Instructions, Criminal, No. 7.08, pertaining to "Issues In Involuntary Manslaughter" (Illinois Pattern Jury

Instructions, Criminal, No. 7.08 (4th ed. 2000) (hereinafter, IPI Criminal 4th)) and (2) IPI Criminal 4th No. 5.01, which defined recklessness. Thus, the jury could have found defendant guilty of the lesser-included offense of involuntary manslaughter but, nonetheless, determined that the evidence supported a conviction for first degree murder.

¶ 56                         B. The Plain-Error Doctrine

¶ 57    We note that in his brief to this court, defendant–who acknowledges his forfeiture of two issues by failing to properly preserve them for our review–urges this court to excuse his forfeiture and consider these claims under the plain-error doctrine.

¶ 58    "To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion." *People v. Thompson*, 238 Ill. 2d 598, 611, 939 N.E.2d 403, 412 (2010). Failure to do so results in the forfeiture of that claim on appeal. *Id.* at 612, 939 N.E.2d at 412. A defendant can avoid the harsh consequences of forfeiture under the plain-error doctrine. *Id.* at 613, 939 N.E.2d at 413.

¶ 59    The plain-error doctrine permits a reviewing court to reach a forfeited error affecting substantial rights in the following two circumstances: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007).

¶ 60    As a matter of convention, reviewing courts *typically* undertake plain-error analysis by first determining whether error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010); see also *People v. Bowens*, 407 Ill. App. 3d 1094, 1108, 943 N.E.2d 1249, 1264 (2011) (where this court held that "the usual first step in plain-error analysis is to determine whether any error occurred"). "If error is found, the court then proceeds to consider whether either of the [aforementioned] two prongs of the plain-error doctrine have been satisfied." *Sargent*, 239 Ill. 2d at 189-90, 940 N.E.2d at 1059. In this case, we elect to first decide whether the trial court committed error, as defendant argues.

¶ 61                         1. *Instruction on Causation*

¶ 62    Defendant argues that the trial court erred by failing to ensure the jury was properly instructed. We disagree.

¶ 63    "Generally, the decision to give certain jury instructions rests with the trial court, and that decision will not be reversed on appeal absent an abuse of that discretion." *People v. Hale*, 2012 IL App (4th) 100949, ¶ 19, 967 N.E.2d 476.

¶ 64    The jury instruction on causation in homicide cases, which defendant claims is at issue, reads as follows:

> "In order for you to find that the acts of the defendant caused the death of [the victim], the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole immediate cause of death." Illinois Pattern Jury

Instructions, Criminal, No. 7.15 (4th ed. Supp. 2011) (hereinafter, IPI Criminal 4th No. 7.15 (Supp. 2011)).

¶ 65 In the Committee Note to IPI Criminal 4th No. 7.15 (Supp. 2011), the following recommendation is provided:

"The Committee recommends that this instruction be given whenever causation is an issue under [s]ection 720 ILCS 9-1(a)(1) (intentional murder), 9-1(a)(2) (knowing murder), or 720 ILCS 5/9-3(a) (reckless homicide). However, when felony murder (720 ILCS 9-1(a)(3)) is charged and causation is an issue, Instruction 7.15A should also be given." IPI Criminal 4th No. 7.15, Committee Note (Supp. 2011).

¶ 66 At the May 2013 jury instruction conference, the trial court stated, "the problem [the court] see[s] with [IPI Criminal 4th No.] 7.15 [(Supp. 2011)] is that it should be limited to count I." The State agreed, and defense counsel stated, "I believe that's in conformity with the IPI." The court then referred to the Committee Note to IPI Criminal 4th No. 7.15 (Supp. 2011) and reiterated that IPI Criminal 4th No. 7.15 (Supp. 2011) "should be given when intentional or knowing murder is charged and causation is an issue."

¶ 67 Based on the parties' agreement to modify IPI Criminal 4th No. 7.15 (Supp. 2011) by confining the instruction to count I, the State proffered a revised jury instruction. The jury was instructed as follows:

"Under [c]ount I, in order for you to find that the acts of the defendant caused the death of *** Montague, the State must prove beyond a reasonable doubt that the defendant's acts were a contributing cause of the death and that [the] death did not result from a cause unconnected with the defendant.

However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

¶ 68 In support of his argument that the trial erred by failing to ensure the jury was properly instructed, defendant takes issue with the court's determination to confine the jury instruction on IPI Criminal 4th No. 7.15 (Supp. 2011) to count I. Relying on the Committee Note to IPI Criminal 4th No. 7.15 (Supp. 2011), defendant contends that "[t]he court instructed the jury that the State did *not* need to prove that [defendant's] acts were the sole and immediate cause of Montague's death *** to find [him] guilty of first degree murder, but did not instruct [the jury] that this also was true for the offense of involuntary manslaughter." (Emphasis in original.) Thus, defendant posits that the court's omission "left the jury with the incorrect understanding that [his] acts did have to be the sole and immediate cause of Montague's death *** for [the jury] to find him guilty of involuntary manslaughter." We reject defendant's claim that the court's failure to instruct the jury that IPI Criminal 4th No. 7.15 (Supp. 2011) also applied to involuntary manslaughter was error, much less plain error.

¶ 69 We find instructive the Second District's decision in *People v. Walker*, 2012 IL App (2d) 110288, 982 N.E.2d 269. Although *Walker* concerned causation in a felony murder case under Illinois Pattern Jury Instructions, Criminal, No. 7.15A (4th ed. Supp. 2011) (hereinafter, IPI Criminal 4th No. 7.15A (Supp. 2011)), we find it equally applicable to the facts of the instant case. In *Walker*, the defendant argued that the trial court committed plain error when it did not *sua sponte* give the jury IPI Criminal 4th No. 7.15A (Supp. 2011), where causation was an issue for felony murder. *Walker*, 2012 IL App (2d) 110288, ¶ 20, 982 N.E.2d 269. After determining that the causation instructions contained in IPI Criminal 4th No. 7.15A (Supp.

- 11 -

2011) did not set forth the essential elements of felony murder, the court rejected the defendant's plain-error claim, concluding that a trial court need only advise the jury on the essential elements of the crime charged. *Walker*, 2012 IL App (2d) 110288, ¶ 22, 982 N.E.2d 269.

¶ 70   In this case, as we have previously stated, the trial court properly instructed the jury on (1) the propositions the State must prove beyond a reasonable doubt to sustain a charge of involuntary manslaughter under IPI Criminal 4th No. 7.08 and (2) IPI Criminal 4th No. 5.01, which provided a definition of "Recklessness." Thus, based on *Walker*, with which we agree, the court was under no obligation to provide IPI Criminal 4th No. 7.15. Further, the record reveals that during closing arguments, defense counsel conceded that the State had met its burden of proof to sustain a conviction for involuntary manslaughter–in other words, defense counsel admitted that defendant's reckless act of punching Montague resulted in his death. Defense counsel's concession appears to support a trial strategy that the jury should have found defendant guilty of the lesser-included offense of involuntary manslaughter instead of first degree murder, which, we note, is the same position defendant raises with this court. In light of that admission, we reject defendant's claim that the omission of a causation instruction under IPI Criminal 4th No. 7.15 (Supp. 2011) "created a [severe] threat to the fairness of [his] trial."

¶ 71                                   *2. Defendant's Statements*

¶ 72   Defendant also argues that the trial court erred by failing to prevent the jury from considering impermissible other crimes evidence. We disagree.

¶ 73   " 'It is well settled under the common law that evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes.' " *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 58, 2 N.E.3d 642 (quoting *People v. Chapman*, 2012 IL 111896, ¶ 19, 965 N.E.2d 1119). "To necessitate reversal, the other-crimes evidence 'must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different.' " *Id.* ¶ 59, 2 N.E.3d 642 (quoting *People v. Hall*, 194 Ill. 2d 305, 339, 743 N.E.2d 521, 541 (2000)). In other words, the evidence "must be so prejudicial that the defendant is denied a fair trial." *People v. Pelo*, 404 Ill. App. 3d 839, 865, 942 N.E.2d 463, 486 (2010).

¶ 74   The "other crimes" statements defendant contends were inadmissible occurred during his September 2012 interview with police. Specifically, defendant directs our attention to the following exchanges:

"[CLARK]: So, it's been pretty rough it sounds like.

   ***

[DEFENDANT]: It's pretty much where it is, and I don't have anybody that I can go talk to. They are like oh, well go to Life Links. Yeah, that's [$150]. I don't have that kind of money. I'm a dry waller. I make about [$200-$250] a week. By the time I pay my phone bill, get *** diapers and shit for the kids *** make sure I got food for myself, I'm broke.

[CLARK]: Don't last long does it?

[DEFENDANT]: I'm broke. And I'm just tired of *being this way*. I'm tired of living life in a fucking hole. I *want to get out of it*, but, I keep *doing dumb shit like this*. I know

- 12 -

I shouldn't. *** I'm just sitting here in the back of my head like just turn around and walk ahead. Just turn around and walk away. Just turn around and walk away. No." (Emphases added.)

¶ 75    In explaining that Montague initially misidentified him as someone who had assaulted him weeks earlier, defendant continued explaining his encounter with Montague on the night of September 8, 2012, as follows:

"You know, and [Montague] came up with an altercation right off the bat. And I'm like, no, no, no, no, you know, it's just me. And [Montague] was like la-la-la. So finally we got to talking and then it just I don't know if something clicked in [Montague's] head, you know what I mean[?] [Montague] thought I was that guy again after just explaining myself. But it just became, you know, another altercation ***. And, you know, *I'm on probation for this dumb shit*. I should have just, you know, *I just got out of jail for this*. I should have learned to walk away, you know what I mean[?]" (Emphases added.)

¶ 76    Defendant also claims that the jury should not have been allowed to consider the following statements he made at the September 2012 interview regarding the possible punishment he was facing:

"[DEFENDANT]: But *** it just didn't happen that way. And then like this morning, they're like, oh, there has been a murder. And it's like, really[?] *So, now like all day I've had this [in] the back of my head like I'm going to jail for fucking murder*. And I'm gonna get, you know, robbery with it. *That's prison time*.

[CLARK]: Ultimately that is up to the State's Attorney what they elect to…

[DEFENDANT]: And probably.

[CLARK]: …charging any of this, okay[?]

[DEFENDANT]: Right, but I'm just, it makes me feel worse, you know, it's like, you know, my kid is only 16 months. *I'm gonna do at least five years, six years*." (Emphases added.)

¶ 77    In *Patterson*, 2013 IL App (4th) 120287, ¶ 64, 2 N.E.3d 642, this court considered and rejected the same argument defendant makes to this court–that is, that the trial court improperly admitted other crimes evidence in the form of certain statements the defendant made during his interviews with police. The numerous statements the defendant took issue with concerned generally, (1) his capacity for violence, which included breaking a woman's nose and jaw; (2) his criminal history, which included a conviction for unlawful use of a weapon; (3) that he had been " 'going to jail all [his] life' " for " 'dumb shit' "; (4) his illicit drug use; (5) his desire to obtain a firearm; and (6) his involvement in other homicide cases. *Id*. ¶ 63, 2 N.E.3d 642. In rejecting the defendant's argument, this court noted that the context of the challenged statements was of paramount concern to explain "the logic of the interview" and emphasized that a significant interest exists in avoiding the presentation of police interviews in a " 'piecemeal' fashion" *Id*. ¶ 66, 2 N.E.3d 642. In this regard, we found the context of the defendant's interview–which occurred the day after the victim disappeared–indicative of defendant's guilty conscience. *Id*.

¶ 78    Unlike *Patterson*, the statements defendant challenges in the instant case are far fewer and are considerably vaguer. However, as in *Patterson*, when placed in their proper context, the challenged statements provide valuable insight concerning the fear and anxiety defendant

exhibited less than 24 hours after Montague's death, which could have provided the jury a window in which to view his guilty conscience. More important, the record does not show that the challenged statements were used to argue defendant's propensity to commit crimes. Therefore, we reject defendant's claim that the challenged statements were a material factor in his conviction, such that, without this evidence, the jury would have returned a not guilty verdict. Accordingly, we find no error occurred.

¶ 79                             C. Ineffective Assistance of Trial Counsel

¶ 80    Defendant also contends that his trial counsel was ineffective for failing to (1) explain in closing argument why the jury should find defendant guilty of involuntary manslaughter instead of first degree murder, (2) request that the trial court properly instruct the jury on IPI Criminal 4th No. 7.15 [(Supp. 2011)], and (3) prevent the jury from considering impermissible other crimes evidence. Defendant also posits that the cumulative effect of these aforementioned errors warrants reversal of his convictions.

¶ 81    "To show ineffective assistance of counsel, a defendant must demonstrate that 'his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' " *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601 (quoting *People v. Patterson*, 192 Ill. 2d 93, 107, 735 N.E.2d 616, 626 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687, 695 (1984)). "Further, in order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Smith*, 195 Ill. 2d 179, 188, 745 N.E.2d 1194, 1200 (2000).

¶ 82    This court has long held that "[c]laims of ineffective assistance of counsel are usually reserved for postconviction proceedings where a trial court can conduct an evidentiary hearing, hear defense counsel's reasons for any allegations of inadequate representation, and develop a complete record regarding the claim and where attorney-client privilege no longer applies." *People v. Weeks*, 393 Ill. App. 3d 1004, 1011, 914 N.E.2d 1175, 1182 (2009) (citing *People v. Kunze*, 193 Ill. App. 3d 708, 725-26, 550 N.E.2d 284, 296 (1990)).

¶ 83    Because we have already determined that the trial court did not err by failing to (1) ensure the jury was properly instructed and (2) prevent the jury from considering impermissible other crimes evidence, we reject defendant's ineffective assistance of counsel claims as to those issues. Because we lack a record fully developed to properly consider defendant's remaining ineffective assistance of counsel claims, we decline to consider the merits on direct appeal.

¶ 84                                    III. CONCLUSION

¶ 85    For the foregoing reasons, we affirm the trial court's judgment. As part of this judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2012).

¶ 86        Affirmed.