# Illinois Official Reports

## Appellate Court

---

**People v. Elizondo, 2021 IL App (1st) 161699**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALVARO ELIZONDO, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-16-1699 |
| Filed<br>Rehearing denied | September 17, 2021<br>December 14, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-16123; the Hon. Angela M. Petrone, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Gilbert C. Lenz, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.<br>Justices Harris and Connors concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a jury trial, defendant, Alvaro Elizondo, was convicted of second degree murder and sentenced as a Class X offender to a 24-year prison term. On appeal, defendant contends that (1) his conviction should be reduced to involuntary manslaughter because the State failed to prove beyond a reasonable doubt that he was practically certain that his conduct would cause death or great bodily harm; (2) the State denied him a fair trial when it committed prosecutorial misconduct during its closing arguments; (3) trial counsel was ineffective for failing to request Illinois Pattern Jury Instructions, Criminal, No. 5.01B(2) (4th ed. 2000) (hereinafter, IPI Criminal 4th)), which defines knowledge, when defendant's mental state was the crucial question before the jury and the instruction would have informed the jury about the difference between reckless and knowing; (4) his case should be remanded for a new trial because the trial court's failure to preserve the sealed Department of Children and Family Services (DCFS) records that were reviewed and impounded by the trial judge prior to trial denied defendant his fundamental right to appeal the court's decision not to release those records to the parties in discovery; and (5) the trial court erred by sentencing defendant to 24 years' imprisonment after placing great weight on two improper factors in aggravation or, alternately, where defendant was 45 years old and had not committed an offense in more than 20 years, his sentence was excessive. For the following reasons, we affirm.

¶ 2                                   BACKGROUND

¶ 3     The circumstances surrounding defendant's conviction stem from the beating of Juan Guillermo Zavala, a/k/a "Memo" (decedent) on July 4, 2013, at 4401 South Wolcott Avenue (the Wolcott building) in Chicago. Decedent ultimately died from his injuries that were sustained from the beating, and defendant was charged with first degree murder. Defendant was also charged with aggravated battery of his mother, Gusemina Perez.[1] Prior to trial, the trial court granted the State's motion *in limine* to bar, among other things, any reference to defendant's sister, Laura Elizondo's arrest history, arrest booking photos, or any testimony regarding her loss of custody of her children as unrelated to this case and irrelevant to the matter before the court. Additionally, the trial court issued a written order on February 16, 2016, indicating that it found that none of the subpoenaed DCFS records regarding Laura and her daughter, V.O., contained material that was arguably discoverable and denied defendant's request to have such records released for discovery.[2] The trial court then ordered that the DCFS records be impounded with the clerk of the circuit court of Cook County for purposes of appellate review only. Defendant's trial commenced on March 8, 2016, where the following evidence was presented.

¶ 4                               A. Trial Proceedings

¶ 5     Martin Rodriguez testified that he lived at the Wolcott building on July 4, 2013, and that defendant and his family were his neighbors on the second floor. Defendant's family consisted of his mother (Perez), his sister (Laura), and his niece (V.O.). Martin stated that decedent also

---

[1]Ms. Perez died of natural causes prior to defendant's trial.

[2]Although the order references a written motion, the record does not contain a copy of this motion; the only discovery motion by defendant contained in the record did not request any DCFS records.

lived in the apartment with defendant and his family. Martin identified defendant in court and testified that he called defendant "Alvaro," "Al," and "Lasso." Martin stated that when he arrived home at approximately 9:30 p.m., there was a barbecue taking place and Perez, Laura, decedent, V.O., and other people were present. Martin got a plate and walked over to his friends. He saw decedent have a few beers but did not see either Laura or decedent with a pipe or smoking anything.

¶ 6    At approximately 9:45 p.m., defendant arrived and subsequently had an argument with Laura. Decedent, who was Laura's boyfriend, was approximately 5 to 10 feet away. Decedent then walked over to where defendant and Laura were arguing, and defendant punched him in his right jaw. Martin stated that he was approximately 10 feet away and did not see decedent do anything to defendant before defendant hit him. After defendant punched decedent, decedent fell to the concrete, hit his head, and did not move. Martin walked towards decedent, waiting for someone to bring something to wake him up, but he did not wake up. He told everyone to call the police, but since no one had a phone, he went inside and made two calls to 911: one in English and one in Spanish. When he returned outside, Perez was lying on the grass and decedent's face was bleeding. Laura went upstairs and returned with a bucket with some liquid in it, which she threw at defendant, and they both start running; defendant ran south towards 45th Street. Some of the other guests helped Perez up from the ground, and Martin flagged down the police and ambulance once they arrived. Martin testified that defendant returned to the building approximately 45 minutes to an hour later, and when the police subsequently came to his house, he pointed defendant out to them. Martin also stated that he never heard defendant threaten his mother that night.

¶ 7    On cross examination, Martin testified that decedent and defendant did not really get along and they had a few physical fights but would also sometimes drink or work together. After those fights, decedent was always okay later. Martin reiterated that on July 4, 2013, both decedent and Laura had been drinking at the nearby block party. He also testified that during the 15 to 20 years that he knew Laura, he had seen her use crack cocaine on prior occasions, and he had seen decedent drink alcohol. Martin also stated that defendant started yelling after he was put in the police car.

¶ 8    On redirect examination, Martin clarified that he never personally saw defendant and decedent fight previously but heard about the fights from others. On the date of this fight, defendant appeared to be drunk. Martin heard defendant yell "I want to kill you" from the police car.

¶ 9    Dr. James Filkins, a former assistant medical examiner for the Cook County Medical Examiner's Office testified that he performed an autopsy on decedent on July 21, 2013. Decedent had been hospitalized for approximately 2½ weeks when he died. Filkins indicated that decedent was 46 years old, weighed 227 pounds, and was 5 feet, 8 inches, tall. He noted the following external injuries to decedent: a large bruise on the back of the shoulders that measured 12 inches by 8 inches in dimension and an abrasion on the underside of his left cheek that measured 0.9 inches by 0.8 inches. Filkins also noted the following internal injuries to decedent's head and brain, namely specific patterns of hemorrhage in different locations: "subgaleal hemorrhages" or bleeding to the space above his left ear measuring 3 by 2 inches and to the space over his right ear measuring 4 inches by 1.8 inches. Filkins further stated that as part of the autopsy he examined decedent's medical records to look for any injuries reported by a radiologist that he would be unable to determine just by looking. In doing so, Filkins noted

that decedent's medical records indicated a nasal fracture and a fracture to the occipital bone of the skull. He also noted that decedent had cirrhosis of the liver. Filkins opined that decedent died from complications of blunt head trauma, which were consistent with being punched in the face, falling back and hitting the head on concrete, and having one's head slammed on the concrete. He further opined that decedent's manner of death was homicide.

¶ 10     On cross examination, Filkins clarified that there was also bleeding within the substance of decedent's brain on the right front and side as well as in the undersurface of the brain. He further indicated that decedent's cirrhosis of the liver complicated his injuries because it affected the ability of his blood to clot properly.

¶ 11     On redirect examination, Filkins stated that if decedent had not experienced blunt head trauma on July 4, 2013, his life expectancy would have been greater than 2½ weeks.

¶ 12     Laura testified that on July 4, 2013, she lived at the Wolcott building, which was a six-unit building, in the first-floor rear unit. She testified that she lived there with her mother, decedent, her daughter, her grandson, and defendant. She and decedent dated for nine years. Laura identified defendant in court as her brother. She stated that her mother lived in that apartment for approximately 25 years and Laura had only returned there a few months prior to July 2013. On July 4, 2013, she had a cookout for her family on the 44th Street side of the building, with a grill set up on the parkway near a tree. Laura had also set up an inflatable swimming pool for her grandchildren. Some of her neighbors attended, along with her mother, 13-year-old V.O. (her daughter), her granddaughter, and decedent. Defendant stopped by the cookout at approximately 2 p.m., had a couple of beers, and left.

¶ 13     When it got dark, decedent lit fireworks in the alley and Laura heard defendant coming around the corner, "hollering and screaming." He was walking on Wolcott Avenue, coming from the direction of 43rd Street and was yelling "call the police." Defendant then sat down in an empty chair and kicked the swimming pool, so Laura took the pool, emptied the water onto the street, and began to deflate it. She and defendant began to argue, and defendant called her "a f*** b***," and a "crack w***." She told him to leave because he was drunk. Decedent then came to where she and defendant were and stood to her left. According to Laura, decedent did not say or do anything to defendant; however, defendant made a fist and punched decedent in the face, and decedent fell backwards. Decedent was knocked out cold and was unresponsive for the rest of the night. Her mother began walking towards defendant and Laura, hollering and screaming in Spanish for defendant to stop because decedent could not defend himself. Laura testified that her mother was blind in one eye and used a cane or walker. Defendant approached their mother and pushed her down to the ground, and she hit her head. Laura stated that defendant said something to her mother before coming back towards Laura and chasing her around cars that were parked on the street. Defendant subsequently picked up the grill and threw it over the cars toward Laura while she stood in the street, and one of the legs hit her on the arm. Laura then saw defendant go over to where decedent was lying, kneel over him, and begin to beat him in the face before grabbing decedent by the hair and pounding his head against the sidewalk. Laura testified that decedent was still unconscious at that time. Meanwhile, neighbors helped their mother up and led her back to her chair.

¶ 14     Laura then ran into the building and up to her apartment where she grabbed the first thing she saw, which was a bottle of bleach. She ran back outside and told defendant to leave decedent alone. When defendant turned towards her with a smile on his face and his fists closed, Laura threw the bleach in his face and ran. She saw defendant run in the opposite

direction toward Wolcott Avenue. Laura then went to check on her mother before running upstairs to check on her daughter and granddaughter; she then called the police. Laura could hear defendant outside telling their mother that he was going to kill Laura in front of her and then kill her. Laura then returned outside to where decedent was still lying on the sidewalk. Defendant was not there when she first went outside, but he came back so she called the police again. Laura yelled at him to leave, and defendant screamed and yelled at her that he was going to "kick [her] a*** and kill [her]."

¶ 15        After an ambulance arrived for decedent, Laura went to a friend's house to have a few beers. She visited decedent in the hospital the following day, and he was still unconscious. She saw him lying in bed, hooked up to a machine. There was a bald spot on the side of his head, and his mouth was "all beat up." Laura never saw decedent regain consciousness; he remained hospitalized for 16 days, during which time his mother arrived from Mexico. Decedent was subsequently taken off life support, and he died shortly thereafter. Laura also identified a death certification for her mother, who was 73 years old when she died. The trial court allowed the State to play the audio from one of Laura's 911 calls over defendant's objection, finding that it showed defendant's state of mind during the occurrence. Laura identified herself as the caller and identified defendant's voice shouting in the background.

¶ 16        Laura then testified to her background as a crack cocaine addict and indicated that she had both inpatient and outpatient treatment for her addiction. She was clean and sober at the time of trial and last used crack cocaine seven years prior to trial. Laura testified that when she met decedent, he took her off the streets and helped her to change her life. She stated that neither she nor decedent were smoking crack on July 4, 2013, at the cookout.

¶ 17        On cross examination, Laura testified that during the various times that she lived with her mother, decedent was with her and that he and defendant knew each other and were sort of friends. They would occasionally have a drink together as well as with other people. Laura stated that decedent and defendant never had a fist fight, although defendant did punch him out two other times. She testified that she first witnessed such an incident four years prior to 2013 when defendant knocked decedent unconscious after an altercation, and she poured water on decedent's face to wake him up. The second incident occurred six months prior to July 2013 where she saw defendant on top of decedent punching him after he was already knocked unconscious. Decedent was out cold for a few minutes before regaining consciousness; he tried to stay away from defendant after that. Laura stated that on both occasions there was alcohol involved, although she was not drinking when the first incident occurred. Laura further testified that on July 4, 2013, decedent started drinking from the beginning of the cookout until the incident happened, although she only had two beers that day. She denied that she was using a crack pipe that day. Laura further testified that she did not speak to the police right after the incident but spoke with Detective Ignatius Kumiega the following day. Defense counsel questioned whether Laura was outside or inside when she threw the bleach at defendant, noting that her handwritten statement to police indicated that defendant chased her up the stairs and she threw the bleach at him. Laura stated that she did not throw bleach on defendant inside but insisted that she was outside. Laura also stated that she did not recall whether she told Detective Kumiega that defendant banged decedent's head on the concrete nor was it in her handwritten statement. Additionally, Laura could not recall if she told police that her mother hit her head on the ground when defendant pushed her or whether she said she fell on her hands and behind.

Defense counsel also questioned Laura about an incident in September 2012 when police were called because decedent chased her with a hammer, which she denied.

¶ 18 On redirect examination, Laura testified that she and defendant smoked crack together when she first began using drugs. She further stated that defendant became belligerent when he drank, while decedent would be calm when he drank.

¶ 19 Dr. Frederick Starr testified that he was a trauma surgeon at the John H. Stroger Jr. Hospital of Cook County, and he was on call when decedent arrived at the hospital on July 4, 2013. Dr. Starr stated that decedent suffered blunt head trauma and had a depressed level of consciousness, so he was placed on a ventilator. He further stated that he examined decedent and observed an abrasion on the right side of his face near his eye, a skull fracture, and bleeding on his brain. Dr. Starr confirmed that decedent's blood was not clotting properly, and thus he was unable to do any intervention for the brain bleeding. During the time that decedent was in the hospital, the bleeding got progressively worse, and his brain function decreased. The hospital was able to reach decedent's mother in Mexico, and she elected to have him placed on do not resuscitate (DNR) status. His mother eventually arrived from Mexico and elected to discontinue the ventilator, and decedent died several hours later. Dr. Starr further testified that toxicology reports revealed that decedent's blood alcohol level was 0.25 and showed the presence of cocaine in his system, which could still show up seven days after cocaine use. Dr. Starr also corroborated that decedent had cirrhosis of the liver, a very large spleen, and dilated veins, which was common in people who had cirrhosis. Dr. Starr concluded that decedent's death was caused by traumatic brain injury brought about by blunt trauma.

¶ 20 On cross examination, Dr. Starr stated that when decedent arrived at the hospital, he was an unidentified patient of multiple blunt traumas without any detail on how the blunt force trauma occurred. Dr. Starr also indicated that decedent initially responded to voice commands such as to open his eyes when directed but was unable to perform other motor functions.

¶ 21 V.O. testified that she was Laura's daughter and was 14 years old at the time of trial. She confirmed that on July 4, 2013, she lived at the Wolcott building with her grandmother, mother, uncle (defendant), and decedent. V.O. identified defendant in court as her uncle and confirmed that he was not present at the cookout but arrived when decedent was lighting fireworks. She also confirmed that he yelled "police, police" when he arrived, and he looked like he was drunk. V.O. stated that decedent was like a father to her and that she had a good relationship with defendant. She saw her mother deflating the pool and heard an argument between defendant and her mother. Decedent walked over to defendant and her mother, and defendant punched him. She did not see decedent say or do anything before defendant punched him, and decedent fell to the ground and hit his head on the concrete after being punched. V.O. never saw decedent move again after that. Defendant then started chasing her mother around the car and threw a grill at her. V.O. saw the grill hit her mother on the arm. She then saw defendant go back to decedent, grab him by the head, and pound it on the concrete. Her grandmother then walked toward decedent, telling defendant to stop, and he pushed her down. When her grandmother fell, she hit her head on the concrete. Meanwhile, her mother rushed upstairs, came down with a bottle of bleach, and threw it in defendant's eyes when he turned around. Martin then left to call the police, and defendant ran away only to return approximately 30 minutes later. V.O. further stated that she never saw her mother or decedent doing any drugs during the cookout.

- 6 -

¶ 22 On cross examination, V.O. stated that she did not recall her statements to detectives immediately following the incident. Defense counsel also asked V.O. questions about whether she loved her mother, wanted her to be happy, and whether she came to court with her mother. On redirect examination, V.O. testified that in 2013 her grandmother was like her mother and that, at the time of trial, she had been adopted by her sister.

¶ 23 During a sidebar, defense counsel argued that the door may have been opened to discuss Laura's involvement with DCFS and the fact that V.O. was taken from her custody. The State questioned the relevancy of that information to the trial, and the trial court indicated that the questions asked on redirect were in response to defense counsel's cross examination of V.O. The court further found that any DCFS actions would be "far afield," were not relevant, and disagreed that the door was opened.

¶ 24 Chicago police officer James McCrillis testified that on July 4, 2013, while on patrol, he responded to a call at the Wolcott building as backup for another unit who was investigating a battery in progress. He approached the scene and saw decedent lying on the ground unresponsive. There was no offender on the scene, and he attempted to give medical aid to the decedent, who was unconscious and unresponsive. Officer McCrillis later learned defendant's name and identified him in court. He subsequently saw defendant in the back of a police car and went to handcuff him at approximately 10:30 p.m. Officer McCrillis heard defendant scream that he would cut his mother into little pieces and that he wanted to scoop out his sister's eyes. Defendant also stated that he wanted to kill his family.

¶ 25 On cross examination, Officer McCrillis testified that although the scene was chaotic, it was not difficult to figure out what happened as there was a person on the ground unconscious, and it was a battery in progress. He also testified that he encountered Laura at the scene and that she was yelling, uncooperative, and appeared distraught. Additionally, Perez refused medical treatment at the scene. Officer McCrillis did not observe any weapons at the scene, and when he arrested and cuffed defendant, defendant was cooperative. When they arrived at the police station, he observed injury to defendant's eyes; specifically, that he had bleach thrown in his eyes and defendant was taken to the hospital. Officer McCrillis further testified that, according to his case incident report, Laura stated that defendant was trying to attack decedent, their mother intervened and was pushed to the ground, and defendant then struck the victim in the head, causing him to fall to the ground.

¶ 26 Defendant made an oral motion for directed verdict, which the trial court denied. Defendant then presented his case-in-chief. Detective Destry Wilborn testified that on July 4, 2013, he was assigned to investigate a case involving decedent, and he went to the Wolcott building to interview witnesses. He testified that he interviewed V.O. that night, who never stated that she saw defendant drunk, saw defendant grab decedent by the head and knock his head to the ground, or saw defendant push her grandmother to the ground. Additionally, Detective Wilborn stated that V.O. said that decedent walked between defendant and her mother and that she was unsure of decedent's name. He attempted to interview Laura that night but could not because she was intoxicated and they could not wake her up.

¶ 27 On cross examination, Detective Wilborn testified that V.O. told him that her uncle struck her mother's boyfriend four to six times while he was on the ground.

¶ 28 Detective Kumiega testified that he interviewed witnesses in connection with this case on July 5, 2013. He interviewed V.O., who never told him that she saw her uncle drunk or that she saw her uncle grab decedent and slam his head to the ground. He also interviewed Laura,

who never told him that she saw defendant grab decedent and slam his head to the ground or that she saw defendant smiling at her. Additionally, Laura never told him that she saw her mother get pushed and hit her head on the concrete. Laura did tell him that she and decedent dated for seven years and that when defendant chased her upstairs, she grabbed bleach and threw it on him.

¶ 29    On cross examination, Detective Kumiega testified that Laura stated that her mom was standing by the decedent when she screamed stop and defendant pushed her and she fell on her hands and behind. Additionally, V.O. was 11 years old at the time he interviewed her.

¶ 30    When the trial court sustained the State's objection to defense witness, Officer Robert Kellam, defense counsel made an offer of proof. In the offer of proof, defense counsel stated that Officer Kellam would testify about a domestic call on September 9, 2012, at 4506 South Wood Street where Laura Diaz told him that her boyfriend of seven years, Amelio Canales, chased her down the stairs with a hammer and said he would bash her head in. Officer Kellam would also testify that she told them she wanted him locked up, the man was placed under arrest, but the complainant refused to press charges because she had nowhere to go and he paid the rent. The officer would identify a photo of Laura as the person he spoke with and would identify a photo of decedent as the person he arrested that day. Defense counsel sought to introduce this evidence to impeach Laura's testimony that decedent never chased her with a hammer.

¶ 31    Defendant testified on his own behalf that he was 48 years old, and he lived at the Wolcott building on July 4, 2013, and had lived there for approximately 20 years. He lived there with his mother, his niece, and an older man that they took care of. He stated that he was unemployed and did construction off and on. He stated that he knew Martin, who was a resident in the building and a few other neighbors. On the afternoon of July 4, 2013, he testified that he was setting up tables and chairs for a block party on 44th Street and Honore Street, which was a block over from his home. Defendant testified that he was there about four or five hours before going back home. When he went back, he said that he saw his sister (Laura) stick her head out of the door and she was pushing a crack pipe back and forth. He called her a crackhead, and she got upset. When he noticed that her grandchildren were there, he yelled out for someone to call the police because she was inside smoking crack in front of the children. Laura then began to call him names, and she ran up the stairs yelling. Decedent then ran up to defendant and asked what happened, and he told decedent that Laura was in the hallway smoking crack in front of the kids. Defendant stated that he asked decedent to help him get the kids out of there, and decedent spit in his face and punched him on the side of the face. He and decedent began to fight, and he knocked decedent down. At that point, Laura threw bleach on him, which got into his eyes and burned. Defendant then stated that because Laura kept throwing bleach at him, he picked up the inside part of a small grill and threw it at her. He said that Laura then went back inside, and he kicked the swimming pool to see if there was any water in it so he could rinse his eyes, but the pool was empty. Defendant then ran back into the building, but Laura had locked him out of the apartment, so he ran to the neighbor's yard and turned on their spigot to get some water. However, no water came out, so he ran back to his building and Laura stuck her head out of the window, and he thought she was going to throw more things at him. She slammed the window, and he could hear her stomping, so he backed up, and decedent tripped him. When decedent tripped him, he just "started swinging at him." Defendant stated that he hit decedent in the shoulder, in the jaw, and in his face a few times.

By then, Laura was within a few feet of him, so he turned around to run and slammed into his mother and pushed her away. However, defendant did not know it was his mother because his eyes were cloudy and burning. Defendant testified that he did not mean to run into his mother. He kept running around the corner, and he heard a police car. Defendant stopped in the middle of the street and put his hands up to get the police's attention. When the police car stopped, defendant told them what happened and then went back to the building. The sergeant told him to get in the car, so he did.

¶ 32    Defendant stated that he had known decedent for seven or eight years and that they were friends who drank and hung out. He stated that he saw decedent whenever he came around the house to pick up his sister. Defendant further stated that he and decedent had previous physical altercations, approximately more than five or six times. He also testified that he had knocked decedent out on prior occasions during those altercations: the first time being in 2010 in a neighbor's yard. Defendant stated that decedent kicked the neighbor's back gate open, ran right to him, and took a swing at him. When decedent kept swinging at him, defendant hit decedent, and decedent went down. Decedent was knocked out for a few seconds before defendant and his friends helped him up and pushed him out of the yard. Defendant testified to another incident in 2012 in front of his building where he was smoking a cigarette with a friend. According to defendant, decedent came out of the alley drunk. Decedent then ducked back into the alley, urinated, and came back out with his zipper open. When defendant told him to "zipper up," decedent rushed defendant's friend and tried to hit him. Decedent turned and swung at defendant, and defendant knocked him out. V.O. and Laura came outside to try and pick decedent up, but when he regained consciousness, he tried to charge defendant again, so defendant just left. Defendant also testified to another incident where decedent ran up to him in the alley and they fought, but he was unsure if he knocked decedent out that time. Additionally, defendant testified that one time he went to Laura's aid and fought decedent but did not knock him out. And finally, another time decedent blocked his way on the stairs, and he pushed decedent out of the way, which was witnessed by one of his nieces. Defendant admitted that they would both be intoxicated when they would have physical altercations and agreed that alcohol fueled their fights. Defendant added that it was always decedent who started the fights. Defendant stated that after their fights, they would just go back to normal.

¶ 33    With respect to July 4, 2013, defendant admitted that he punched decedent while he was down on the ground but denied that he banged decedent's head on the concrete. He did not know why decedent started the fight with him that day, he was not trying to kill him, and he did not think the altercation would end up like that. Defendant admitted a past history of cocaine use but stated that he never smoked crack cocaine with Laura.

¶ 34    On cross examination, defendant restated that decedent spit on him and threw the first punch, which landed on the right side of his head just above his ear. He further stated that decedent hit him three additional times, in his gut and on his side, and he hit decedent approximately three additional times. Defendant testified that it was the last punch that knocked decedent out cold. He denied knowing that Laura called the police, being gone for 30 to 40 minutes before returning when police arrived, and denied that he did anything wrong that day. Defendant stated that he did not tell Officer McCrillis his version of events on July 4, 2013, because the officer did not ask. He never told Officer McCrillis anything and never told him that decedent spit in his face, that decedent tripped him, that decedent threw numerous punches, that he accidentally tripped his mom. He did not remember if he told the officer that

decedent started the whole event. Nor did defendant recall threatening to kill his mother or scoop out his sister's eyes while he was sitting in the police car. While he recalled listening to the audio of Laura's 911 tape in court, he did not recall hearing his voice in the background, and he testified that he was sober on that day. Defendant stated that he did not recall Detective Wilborn's testimony the previous day, could not recall having his *Miranda* rights read to him while in the hospital, and did not recall if Martin was there that day. He also testified that the entire fight with decedent lasted approximately "a second, maybe a second and a half." Defendant did not recall giving a statement to Detective Alejandro Chavarria on July 5, 2013, in which he stated, "that's what that guy deserves for smoking crack in the house while kids lived there," that he wanted to press charges against his sister for throwing bleach in his eyes, or that he was acting in self-defense. He admitted that he did not see decedent smoking crack cocaine that day and also clarified that he felt decedent kick him with his foot while lying on the ground after being knocked out. He punched decedent as decedent lay on the concrete with his hands up because he was tripped. Defendant further stated that he did not know if decedent ever got up and walked around because there were a lot of people out there and it was blurry.

¶ 35    On redirect examination, defendant stated that he did tell an officer that decedent took a swing at him, which is when he struck decedent in the face and knocked him to the ground. He also stated that he could have been mistaken that decedent tripped him, but at that moment he believed that decedent tripped him, which is why he began punching decedent again. Finally, defendant stated that he did not mean to kill decedent.

¶ 36    The trial court allowed the State to call its rebuttal witness, Detective Wilborn, out of order, during the defense's case because he had a plane to catch that afternoon. Detective Wilborn restated that he Mirandized defendant at the hospital on July 5, 2013, at 3:45 a.m. and also interviewed defendant. Detective Wilborn testified that defendant never told him that decedent punched him first, that there was an exchange of blows, or that decedent tripped him.

¶ 37    On cross examination, Detective Wilborn agreed that his conversation with defendant was short. He testified further that defendant told him that his sister's boyfriend stepped in his face and defendant struck him and knocked him to the ground. Detective Wilborn also stated that he did not take field notes during his conversation with defendant and only generated a supplemental report. On redirect examination, Detective Wilborn stated that defendant told him that his sister and her boyfriend were smoking crack in the house in front of two children.

¶ 38    At an informal instructions conference, the trial court indicated that it would give instructions for first degree murder, second degree murder, and involuntary manslaughter, as well as an instruction that the State must prove that defendant was not justified in his use of force against the victim for each actionable offense. The State argued that defendant's self-defense argument was "completely incongruent" with receiving an involuntary manslaughter instruction because of the different mental states and defendant's testimony that his act was deliberate and intentional. The trial court indicated that it would revisit the issue at the close of the evidence.

¶ 39    The defense resumed its case with the testimony of Barbara Fernandez, who was defendant's niece. She identified defendant in court, identified Laura as her aunt, and identified decedent as Laura's boyfriend. Barbara stated that she lived at the Wolcott building from 2010 to 2011 on the top floor in the front of the building with her sister, Cecelia Fernandez, and her children. She additionally testified that Laura and decedent previously lived in the front middle unit and defendant, her grandmother, and "the kids" lived in the rear of the building. Barbara

testified that she saw defendant and decedent together a few times, that they drank together, and that their relationship was civil. She testified to an incident that happened in the summer of 2011 when she observed an intoxicated decedent slap Laura against the Wolcott building. Laura called to defendant for help, but decedent pushed him away and left. Barbara testified to a second incident that occurred in the winter, sometime between the end of 2010 and the beginning of 2011. In that incident, everyone present was drinking and decedent was intoxicated. When Laura asked him for money, he backhanded her on her face, and they tussled. Defendant told them to stop fighting, and then everyone left. Barbara testified to a third incident that occurred in September or October 2010 in the stairwell at the Wolcott building. According to Barbara, decedent was intoxicated, and he fought with Laura; specifically, he slapped her and pulled her hair. Barbara never called the police because she did not want to get involved. Barbara also testified that at the time of trial, V.O. lived with her sister Natalie and Laura.

¶ 40    On cross examination, Barbara admitted that Natalie adopted V.O. and that Laura lives in the house with them. She stated that Laura had a room in the basement there. Barbara stated that she and Laura had their altercations because Laura was always high and further that she had a good relationship with defendant, different from her relationship with Laura. Barbara visited defendant in jail in September 2015. She also admitted that in September 2015, she had a phone conversation with an investigator from defendant's attorney's office, who asked her if she had seen any altercations between Laura, defendant, and decedent. Barbara answered yes and told the investigator about the incidents that she testified to in court. She identified the investigator's summary investigation, which the investigator brought to her for signature a few days after the phone conversation. Barbara could not remember if the phone interview was recorded and admitted that none of the specific events she testified to involving decedent and Laura were included in the report. However, she stated that the dates in the report were incorrect and that she signed it too fast.

¶ 41    On redirect examination, Barbara testified that she never called the police because she did not want decedent to go to jail, it was none of her business what went on, and decedent financially provided for Laura.

¶ 42    Defendant's other niece, Cecilia, testified on direct to an incident between defendant and decedent in December 2010. She stated that defendant was leaving her third-floor apartment at the Wolcott building while decedent was walking up to the second floor. Decedent blocked the stairwell and "aggressively" grabbed defendant by the shirt and shoved him towards the wall. Defendant then left. Cecelia stated that decedent had a can of beer in his hands. She admitted that she did not call the police about the incident because she did not feel that it needed police involvement.

¶ 43    On cross examination, Cecelia stated that she did not feel the police should have been involved because it ended there. She also stated that she was very close with defendant, and he was her friend as well as her uncle. Cecelia visited him twice and spoke with him on the phone more than once since he was in jail. She stated that she never talked with defendant about what happened to decedent but confirmed that she received a call in September 2015 from an investigator from defendant's attorney's office. During the call, the investigator asked her if she witnessed any altercations between defendant and decedent, and Cecelia told the investigator what she testified to in court. Cecelia could not remember if the call was recorded but did recall that the investigator brought a summary investigation report for her signature

approximately a week later, and she did not make any changes to it. The defense then rested its case.

¶ 44    The State re-called Officer McCrillis in rebuttal. He confirmed that he was one of the first responding officers to the scene at the Wolcott building on July 4, 2013. Officer McCrillis stated that defendant did not tell him that decedent threw the first punch, that decedent spit on him or that decedent tripped him. He further testified that defendant never told him that he and decedent had a fist fight.

¶ 45    On cross examination, Officer McCrillis stated that defendant told him that decedent swung at him but missed. Defense counsel asked whether his case incident report specifically stated that decedent's swing did not hit defendant, and Officer McCrillis responded that the report stated: "[decedent] went after him and he took a swing at him. And at which point [defendant] got on top of him and he hit him." Officer McCrillis stated that it was implied that decedent's swing missed because, if defendant were hit, the report would have so indicated. He indicated that his conversation with defendant was brief and took place while defendant was suffering from an injury to his eyes.

¶ 46    On redirect examination, Officer McCrillis stated that defendant did not know when the bleach was thrown, specifically whether it was before or after the battery.

¶ 47    Detective Chavarria testified that he was assigned to investigate the incident at the Wolcott building on July 4, 2013, at approximately 10 p.m. He learned that defendant was in custody, and he identified defendant in court. The following day, at approximately 5:15 p.m. at the police station located on 31st Street and Halsted Street, he met with defendant and Mirandized him. Defendant initially indicated that he wanted to talk to Detective Chavarria, and they spoke briefly. At no time did defendant tell him that decedent punched him first, spit in his face, or tripped him. Nor did defendant ever say that he was acting in self-defense. Chavarria stated that defendant told him "that's what the guy deserves for smoking crack in the house while kids lived there." Defendant further indicated that wanted to press charges against his sister for throwing bleach in his eyes.

¶ 48    On cross examination, Detective Chavarria stated that he did not know if, after his conversation with defendant, defendant was taken back to the hospital for treatment of his eye injuries. He confirmed that decedent was still alive when he spoke with defendant but was unaware how many days he was alive after the incident.

¶ 49    The parties stipulated that defendant's medical records would show that he was seen at Mercy Hospital on July 5, 2013, at 12:15 a.m. and that defendant denied using drugs, alcohol, or cocaine that day.

¶ 50    Rosa Silva testified that she was an investigator with defense counsel's office and that on September 21, 2015, she received an assignment related to defendant; namely to interview Barbara and Cecelia regarding any incidents they witnessed regarding defendant and decedent. Silva phoned Barbara first and had a 10-to-20-minute unrecorded conversation with her. Silva took no notes during the call and called Cecilia next. She had a similar conversation with Cecilia and, again, took no notes during the call. Silva typed report summaries of both calls on October 5, 2015, from what she remembered of the calls, which she identified in court. Silva read the following from Barbara's statement:

   "Miss Barbara Fernandez stated that she knew that decedent had a history of physically abusing his wife, her aunt Laura. Miss Barbara Fernandez stated that often when

decedent would become abusive toward Laura, she will [*sic*] call [defendant] to help her. Decedent would then turn his aggression on [defendant]."

Silva then read from Cecelia's statement:

"Miss Cecelia Fernandez stated that she knew that decedent had a history of physically abusing his wife, her Aunt Laura. Miss Cecelia Fernandez stated that frequently when decedent got physically abusive with her Aunt Laura, Laura called [defendant] to come to her rescue. When she did, decedent will [*sic*] get physically aggressive with [defendant] and Laura would become upset."

Silva stated that the two statements were exact mirrors of one another and further that Barbara and Cecelia told her the exact same thing in the exact same way. Silva stated that the report reflected what she was told and there were no specific incidents or dates reported.

¶ 51    On cross examination, Silva testified that the reports were summaries and not word-for-word reports of the witnesses.

¶ 52    The trial court held an instructions conference, specifically to clarify the lesser included instruction, among other things. Defense counsel specified that they sought instructions for the lesser mitigated circumstance of second degree murder based on defendant's testimony of self-defense as well as the lesser-included offense of involuntary manslaughter. Defense counsel clarified that they sought an instruction for unreasonable belief in self-defense. There was no discussion or request made at the instructions conference for an instruction defining "knowledge."

¶ 53    The jury retired to deliberate after both parties' closing arguments and the State's rebuttal argument. The jury found defendant guilty of second degree murder and not guilty of aggravated battery.

¶ 54                             B. Posttrial Proceedings

¶ 55    Defendant filed a motion for a new trial and subsequently amended his motion for new trial twice. The second amended motion alleged that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the finding was against the manifest weight of the evidence; (3) defendant was denied due process; (4) defendant was denied equal protection; (5) the trial court erred in allowing the State to present the hearsay statements of Perez over defendant's objections based on hearsay and the confrontation clause; (6) the trial court erred in allowing the State to ask questions that were asked and answered over defendant's objection; (7) the trial court erred by barring defendant from impeaching Martin with his grand jury transcript where he indicated that decedent had come up too close on the argument between Laura and defendant; (8) the trial court erred by allowing the State to play and introduce Laura's 911 call over defendant's objection; (9) the trial court erred by spontaneously overruling her previous ruling and allowing the State to introduce additional hearsay statements of Perez to the jury; (10) the trial court erred by not allowing defense counsel to question Laura about a 2007 incident of domestic violence for impeachment (not *Lynch*) purposes on cross examination; (11) the trial court erred by repeatedly allowing the State to ask Laura leading questions on redirect over defendant's objection; (12) the trial court erred by denying defendant's motion for a directed finding at the close of the State's case; (13) the trial court erred by not allowing defense counsel to call Officer Kellan to prove up impeachment (not *Lynch*) of Laura; (14) the trial court erred by allowing the State to repeatedly ask defendant the same question over

- 13 -

defense counsel's objection; (15) the trial court erred by not modifying IPI Criminal 4th No. 1.02 to include addiction to drugs when there was evidence of witness Laura's addiction to drugs; (16) the trial court erred by not allowing the defense to inquire of its own witness on direct about Laura's crack cocaine use to impeach Laura's credibility; (17) the trial court erred by allowing hearsay testimony over defendant's objection; (18) the trial court erred by not allowing the defense to ask Barbara about a prior consistent statement after the State alleged her recent fabrication; (19) the trial court erred by allowing Silva to testify to whether a report she prepared regarding the statements made by Barbara was similar to a report prepared regarding statements made by Cecelia over defense objection which invaded the province of the jury; (20) the trial court erred by not giving modified IPI Criminal 4th No. 1.02 instruction as requested by defendant; (21) the trial court erred by allowing the State to argue facts not in evidence during closing argument over defense objection; (22) the trial court erred by allowing the State to repeatedly misstate the law in closing and rebuttal over defense objection; (23) the State erred by misstating the law to the jury in closing and rebuttal over defense objection; (24) the State erred by injecting personal views, justifications, and experience into rebuttal over defense objection; (25) the State erred by making inflammatory arguments to the jury in closing and rebuttal over defense objection; (26) the State shifted the burden of proof to the defense by demanding that defendant should have asserted an affirmative legal defense at the police station; and (27) the trial court erred by not allowing the defense to receive the DCFS records it reviewed *in camera* regarding V.O., which may have relevance to the defense's cross examination.

¶ 56     The trial court denied defendant's second amended motion for new trial, finding that the State proved defendant guilty beyond a reasonable doubt of the offense he was convicted of and it believed that the proper rulings were made at the time, as reflected in the record. The matter then proceeded to sentencing.

¶ 57     The State argued in aggravation that defendant's background made him Class X mandatory, noting that ordinarily second degree murder would carry a sentencing range of 9 to 20 years. However, based on defendant's criminal background, the sentencing range was 6 to 30 years. The State noted defendant's criminal history as follows: possession of a stolen motor vehicle (PSMV) in 1991, a Class 2 offense for which he received a four-year prison term; and voluntary manslaughter in 1986, Class 1 offense for which he received a seven-year prison term. The State also argued that defendant had killed two people in his life, a Christmas 1986 stabbing while he was on felony probation for the manufacture-delivery of a controlled substance, and the present case, a Fourth of July beating. The State requested the maximum sentence.

¶ 58     In mitigation, defendant presented several letters to the court from various family members and people who lived in his neighborhood. Defense counsel requested that the court consider that defendant did not contemplate that his conduct would threaten serious physical harm to another, defendant had not been in trouble for over 20 years, the criminal conduct was the result of circumstances that were unlikely to recur as it was a fist fight that went awry, defendant's character and attitude indicated that it was unlikely that he would commit another crime, defendant was trying to get his GED, imprisonment would entail excessive hardship to his dependents, and defendant had some psychological and health issues. Defense counsel, while not requesting the minimum sentence, did request a sentence in the 4- to 20-year range.

¶ 59 Defendant spoke on his own behalf and said that he cared for decedent and did not want this to happen. He stated that he did not know that decedent had cirrhosis of the liver before speaking of the impact his incarceration would have on other family members, especially his father and son. Defendant also expressed a desire to meet his grandson and remarked that the things in his past happened when he was a kid, but he was older.

¶ 60 The trial court noted that defendant was not a "kid" when he was arrested for voluntary manslaughter, rather his presentence investigative report (PSI) reflected that defendant was 20 years old, and 24 years old when he was arrested for PSMV. The court then noted that defendant used multiple birthdays, one in 1966 and one in 1968. The trial court further noted that when defendant's prior voluntary manslaughter occurred, it was on Christmas, and the circumstances in the present case occurred on another holiday, July 4. The court stated that there appeared to be two sides to defendant, the side that was nice to his family and the side that perhaps drank and got wild on holidays, finding that there was no coincidence that someone was killed on Christmas and then again on the Fourth of July. The trial court noted all of the evidence presented in aggravation and mitigation, as well as the evidence presented at trial, and found that defendant's conduct caused or threatened serious physical harm to another. The court also found that it was hard to predict if the circumstances would recur but further noted defendant's own testimony that he had repeatedly beat decedent up and he always survived as indicative of his lack of knowledge of the serious threat of death or bodily injury. The trial court concluded that neither the minimum nor maximum sentence was appropriate and instead sentenced defendant to a Class X 24-year prison term with three years mandatory supervised release.

¶ 61 Defendant's motion to reconsider sentence was denied on June 1, 2016, and defendant's timely appeal followed. Oral argument was held on July 15, 2021.

¶ 62                                ANALYSIS

¶ 63 On appeal, defendant contends that (1) his conviction should be reduced to involuntary manslaughter because the State failed to prove beyond a reasonable doubt that he was practically certain that his conduct would cause death or great bodily harm; (2) the State denied him a fair trial when it committed prosecutorial misconduct during its closing arguments; (3) trial counsel was ineffective for failing to request IPI Criminal 4th No. 5.01B(2), which defines knowledge, when defendant's mental state was the crucial question before the jury and the instruction would have informed the jury of the difference between reckless and knowing; (4) his case should be remanded for a new trial because the trial court's failure to preserve the sealed DCFS records that were reviewed and impounded by the trial judge prior to trial denied defendant his fundamental right to appeal the court's decision not to release those records to the parties in discovery; and (5) the trial court erred by sentencing defendant to 24 years' imprisonment after placing great weight on two improper factors in aggravation or, alternately, where defendant was 45 years old and had not committed an offense in more than 20 years, his sentence was excessive. We shall review each of defendant's issues in turn.

¶ 64                A. Reduction of Conviction to Involuntary Manslaughter

¶ 65 Defendant contends that his conviction should be reduced from second degree murder to involuntary manslaughter because the State failed to prove beyond a reasonable doubt that he

was practically certain that his conduct would cause death or great bodily harm as required for murder.

¶ 66    When reviewing a sufficiency of the evidence claim, the appropriate inquiry is whether, " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 25 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court allows all reasonable inferences from the record in favor of the State. *People v. Mefford*, 2015 IL App (4th) 130471, ¶ 45. The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. *Id.* We will reverse a conviction only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.*

¶ 67    In this case, defendant was charged with first degree murder but raised self-defense at trial, and the jury convicted him of second degree murder. Second degree murder is a lesser mitigated, not a lesser included, offense of first degree murder. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. A person commits the offense of second degree murder when he commits the offense of first degree murder as defined by paragraphs (1) or (2) of subsection (a) of section 9-1 of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1)-(2) (West 2012)), and either of the following mitigating factors are present:

> "(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or
>
> (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." *Id.* § 9-2(a)(1)-(2).

¶ 68    With respect to second degree murder, the fact finder must first conclude that the State proved beyond a reasonable doubt that the defendant committed first degree murder before the fact finder concludes whether the defendant proved by a preponderance of the evidence one of the mitigating factors required for second degree murder. *Id.* § 9-2(c); *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 3.

¶ 69    The difference between first or second degree murder and involuntary manslaughter is in the mental state that accompanies the conduct resulting in the victim's death. *Mefford*, 2015 IL App (4th) 130471, ¶ 48. A defendant commits involuntary manslaughter when, without lawful justification, he unintentional kills an individual by recklessly performing acts that are likely to cause death or great bodily harm. *Id.* A person is reckless or acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to another. *Id.* The mental state required may be inferred from the character of the defendant's acts and from the circumstances surrounding the commission of the offense, and the trier of fact is in the best position to determine whether a particular mental state is present. *People v. Pollard*, 2015 IL App (3d) 130467, ¶ 27.

¶ 70    Involuntary manslaughter is a lesser-included offense of first degree murder. *Mefford*, 2015 IL App (4th) 130471, ¶ 48. As noted previously, defendant was charged with first degree murder. First degree murder occurs when a person kills another person without lawful justification and, in performing the acts that cause the death:

"(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(1)-(2) (West 2012).

Whether a defendant is guilty of murder or involuntary manslaughter is a question for the trier of fact. *Castillo*, 2018 IL App (1st) 153147, ¶ 28.

¶ 71    Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that defendant's conduct constituted knowing murder where the evidence showed that defendant intended to do great bodily harm to decedent. In this case, several witnesses testified that defendant punched decedent in the jaw without provocation, and decedent fell to the ground and hit his head on the concrete. Everyone agreed that decedent never moved after he was knocked out cold and further that defendant punched decedent in the face several more times while he was laying on the sidewalk. Likewise, defendant's own testimony established that he intentionally punched decedent while he lay on the sidewalk. Specifically, defendant stated that because he believed that decedent tripped or kicked him after he had the bleach thrown on him, he just started "swinging on him." Defendant stated that he knelt over decedent and punched him in the face, jaw, and shoulders while he lay on the sidewalk. The State also presented evidence that defendant banged decedent's head on the concrete several times. While defendant agreed that decedent never fought back during this time, he denied that he banged decedent's head on the concrete.

¶ 72    Contrary to defendant's assertion at trial, however, the medical evidence presented through the autopsy results and the treating physician's testimony established that decedent died from bleeding on his brain and had injuries consistent with blunt force trauma, which happened from the initial fall after defendant's knockout punch, and additionally from having his head beat on the concrete. While decedent's injuries were complicated by his cirrhosis of the liver, it was uncontroverted that the beating was the cause of his death. Most notably, both medical professionals stated that decedent would have certainly lived longer than 2½ weeks if it were not for the injuries he sustained from the beating.

¶ 73    There was additional evidence presented that, when arrested at the scene, defendant was screaming that he wanted to kill his mother and scoop out his sister's eyes. There was also evidence presented that after he knocked decedent out, defendant went after his sister, eventually throwing a grill at her, and that his sister threw the bleach on him to stop him from continuing to beat decedent as he lay on the sidewalk. Additionally, when police told defendant that decedent was hospitalized, defendant replied, "that's what the guy deserves for smoking crack in the house while kids lived there," even though he did not see decedent smoke any crack that day. None of the officers testified that defendant ever told them that he was acting in self-defense. This evidence supports a finding that defendant's actions were intentional and not accidental.

¶ 74    Defendant argued at trial, and maintains on appeal, that he did not intend to kill decedent; although he knocked decedent out cold, he expected that decedent would be okay like the previous times. Defendant's entire defense was based on second degree murder, specifically that he beat decedent but was doing so in reaction to the circumstances present at the time. Defendant made this argument despite defense counsel's closing argument that focused on the recklessness of defendant's acts. It is clear from the evidence presented at trial that defendant intended to do great bodily harm to decedent when, after having already knocked him out cold,

defendant punched him several more times while he lay on the sidewalk. We find such evidence supports the inference that defendant's actions were intentional and more than reckless. Moreover, we note that defendant's self-defense theory, which necessarily conceded that defendant's actions constituted first degree murder but that there were mitigating circumstances present, was incongruent with involuntary manslaughter. Thus, we conclude that a rational trier of fact could find the essential elements of second degree murder beyond a reasonable doubt.

¶ 75    We further note that while the jury received instructions on first degree murder, second degree murder, and involuntary manslaughter,[3] the jury returned a verdict for second degree murder. In doing so, the jury concluded that the State proved first degree murder but that defendant had sufficiently proven a mitigating factor. Apparently, the jury rejected the notion that defendant's actions were reckless thereby eliminating the possibility of a conviction for involuntary manslaughter. Such a conclusion was not so improbable or unsatisfactory that it created a reasonable doubt of defendant's guilt. As such, we reject defendant's claim that his conviction should be reduced to involuntary manslaughter.

¶ 76                                    B. Prosecutorial Misconduct

¶ 77    Next, defendant contends that he was denied a fair trial where the State, during closing argument, repeatedly misstated the law as to the difference between murder and involuntary manslaughter, vouched for the credibility of a key witness, alleged without evidence that defendant tampered with witnesses, attacked defendant's character and his counsel's character, and urged the jury to posthumously defend the victim. He contends that the State's improper and often inflammatory comments both misinformed the jurors and distracted them from the factual questions before them, which given their number and significance prejudiced defendant. Defendant also points to two other instances during questioning of witnesses when the State allegedly engaged in misconduct.

¶ 78    As a preliminary matter, we note that none of the complained-of remarks were specifically raised in defendant's motion for new trial. Defendant's motion for new trial contained the following general statements related to the State's closing and rebuttal arguments: the trial court erred by allowing the State to argue facts not in evidence during closing argument over defense objection; the trial court erred by allowing the State to repeatedly misstate the law in closing and rebuttal over defense objection; the State erred by misstating the law to the jury in closing and rebuttal over defense objection; the State erred by injecting personal views, justifications, and experience into rebuttal over defense objection; the State erred by making inflammatory arguments to the jury in closing and rebuttal over defense objection; and the State shifted the burden of proof to the defense by demanding that defendant should have asserted an affirmative legal defense at the police station. Moreover, neither of the two challenges raised to the State's examination of its witnesses were raised in defendant's posttrial motion. Additionally, of the challenged remarks during closing argument, only two were objected to.

¶ 79    To preserve an issue for review, a party ordinarily must raise it at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Thompson*, 238 Ill.

---

[3]This instruction was not requested by defendant but was nonetheless given *sua sponte* by the trial court.

2d 598, 611-12 (2010); *People v. Cregan*, 2014 IL 113600, ¶ 15. This requires that a defendant specifically object at trial and raise the specific issue again in the posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 471 (2005); *People v. Burnett*, 2015 IL App (1st) 133610, ¶ 75. Failure to preserve an alleged error for review is a procedural default. *People v. Rivera*, 277 Ill. App. 3d 811, 818 (1996). We find that defendant did not properly preserve these issues for consideration on appeal and they are forfeited, even though some were generally raised in his posttrial motion. See *People v. Glasper*, 234 Ill. 2d 173, 203 (2009).

¶ 80    Defendant contends that if trial counsel failed to properly preserve these claims for review, we should review them under the plain error doctrine because the evidence was closely balanced, and the cumulative effect of the State's improper questions and arguments denied him a fair trial and cast doubt on the reliability of the judicial process.

¶ 81    The plain error doctrine allows a reviewing court to address defects affecting substantial rights if the evidence is closely balanced or if fundamental fairness so requires rather than finding the claims forfeited. *Woods*, 214 Ill. 2d at 471. Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right. *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 9; *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 51. A defendant raising a plain error argument bears the burden of persuasion. *Thompson*, 238 Ill. 2d at 613.

¶ 82    To establish plain error, a defendant must first show that a clear or obvious error occurred (*id.*) and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (*People v. Naylor*, 229 Ill. 2d 584, 593 (2008)) or that the error was sufficiently grave that it deprived defendant of a fair trial (*People v. Herron*, 215 Ill. 2d 167, 187 (2005)). The first step is to determine whether any error occurred in the State's closing argument. See *People v. Piatkowski*, 225 Ill. 2d 551, 565-66 (2007).

¶ 83    The State has wide latitude in both its opening statements and closing arguments and may comment on the evidence and any fair, reasonable inferences it yields. *Glasper*, 234 Ill. 2d at 204. Prosecutors may not argue assumptions or facts not contained in the record. *Id.* A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *Id.* Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *Id.*

¶ 84    It is improper for the State to make comments that have no other purpose but to arouse the prejudices and passions of the jury. *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 10. A prosecutor may not misstate the law or attempt to shift the burden of proof to defendant. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29. Even if remarks were inappropriate, reversal is only required if they engendered substantial prejudice against the defendant such that it is impossible to tell whether the verdict of guilt resulted from them. *Guerrero*, 2020 IL App (1st) 172156, ¶ 10. Even prejudicial comments may be cured by the court's proper instructions of law. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Thus, the trial court's determination regarding the propriety of a prosecutor's remarks will not be reversed unless there was an abuse of discretion. *Id.*

¶ 85    Our review of the State's entire closing argument and the challenged remarks, in context, reveals that they were not improper. Instead, the State's closing argument focused on the

inferences raised by the evidence it presented at trial. Additionally, the State challenged the defense theory of the case and the evidence proffered by the defense. This is proper during closing argument; it is not error for the State to challenge a defendant's credibility or the credibility of his theory of defense when evidence exists to support the challenge. *Glasper*, 234 Ill. 2d at 207. While the State could have used milder language in some of its remarks, the record is clear that its argument was based on the evidence presented during trial.

¶ 86    Moreover, the trial court admonished the jury both before and after closing arguments that the closing arguments were not evidence and that it would instruct the jury on the law to be applied to the case. The trial court also sustained some of defense counsel's objections and admonished the jury about the effect of sustaining an objection and told the jury to disregard such remarks. The trial court may cure errors by giving the jury proper instructions on the law to be applied, informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial, or sustain the defendant's objections and instructing the jury to disregard the inappropriate remark. *Simms*, 192 Ill. 2d at 396-97. As the reviewing court, we must indulge in every reasonable presumption that the trial court properly exercised the discretion vested in it. *Id.* at 397. We will not disturb a verdict unless it can be said that the remarks resulted in substantial prejudice to the defendant. *Id.*

¶ 87    No such substantial prejudice can be shown here. We have already concluded that the evidence presented at trial was sufficient to sustain defendant's conviction for second degree murder and rejected his argument that he was entitled to have his conviction reduced to involuntary manslaughter. Thus, it is highly unlikely that any error in the prosecutor's closing argument significantly contributed to the jury's verdict. We thus reject defendant's arguments to the contrary and find that no error occurred during closing argument. As such, we decline to apply plain error to consider defendant's claims, and the procedural default stands.

¶ 88    We likewise reject defendant's contention that his trial counsel was ineffective for failing to preserve these issues given the closeness of the evidence because no reasonable strategy justified a failure to object. To demonstrate ineffective assistance of counsel, under the *Strickland* test (see *Strickland v. Washington*, 466 U.S. 668 (1984)), a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90. Defendant must satisfy both prongs of this test, and the failure to establish either is fatal to the claim. *Id.*

¶ 89    Here, we can dispose of defendant's assertion of ineffective assistance of counsel on the prejudice prong. As we have determined that there was no reversible error in the State's closing arguments and further that defendant was not prejudiced by any error in the complained-of remarks, defendant cannot show that he was prejudiced by his trial counsel's failure to object to the complained-of remarks to satisfy *Strickland*. See *id.* ¶ 91.

¶ 90                    C. Failure to Request IPI Criminal 4th No. 501B(2)

¶ 91    Defendant further contends that his trial counsel was ineffective for not requesting IPI Criminal 4th No. 5.01B(2), which defined knowledge and would have informed the jury of the difference between the reckless and knowing mental states when his mental state was the crucial question before the jury. He argues that there is a reasonable probability that the trial court would have agreed to such a request and, given the close evidence on the mental state

- 20 -

element, there is a reasonable probability that the jury would have found him guilty of only involuntary manslaughter if they had received an instruction defining knowledge. We disagree.

¶ 92 Jury instructions are necessary to provide the jury with the legal principles applicable to the evidence presented so that it may reach a correct verdict. *People v. Falco*, 2014 IL App (1st) 111797, ¶ 15. It is well-settled that trial counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims. *People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005). However, the failure of an attorney to request a specific instruction can be ineffective assistance of counsel if the instruction was so critical to the defense that its omission denied the right of the accused to a fair trial. *Falco*, 2014 IL App (1st) 111797, ¶ 16. We review such claims *de novo*. *People v. Sanders*, 368 Ill. App. 3d 533, 538 (2006).

¶ 93 As noted above, to demonstrate ineffective assistance of counsel, under the *Strickland* test, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Jackson*, 2020 IL 124112, ¶ 90. Defendant must satisfy both prongs of this test, and the failure to establish either is fatal to the claim. *Id.*

¶ 94 IPI Criminal 4th No. 5.01B(2) defines knowledge as follows: "A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct." However, a court need not define the term "knowingly" in an original set of jury instructions because the term is within the jury's common knowledge. *People v. Sperry*, 2020 IL App (2d) 180296, ¶ 15; see also IPI Criminal 4th No. 5.01B, Committee Note. Since IPI Criminal 4th No. 5.01B's addition in 1989, a general rule has emerged: if a jury asks the court to define a mental state term, or manifests confusion or doubt regarding such a term's meaning, the court must instruct them accordingly. *Sperry*, 2020 IL App (2d) 180296, ¶ 15; see IPI Criminal 4th No. 5.01B, Committee Note.

¶ 95 Applying those standards to the present case, we find that defendant has not established that his trial counsel was deficient for failing to request IPI Criminal 4th No. 5.01B(2) where there was no request for further definition by the jury and the instruction was not otherwise required to be given. In this case, the jury made two requests during its deliberations. First, it requested a copy of the 911 tape that was played during the trial. Second, it requested a copy of the instructions for each juror. The record reflects that the jury sent no notes related to any substantive matters in the case and did not request the definition of any terms in the original jury instructions. Additionally, defendant's contention that mental state was the "only" issue before the jury is not correct. Defendant was charged with first degree murder, which requires more proof than simply the mental state; the jury also had to determine whether defendant's actions caused the victim's death. We, therefore, conclude that defendant cannot establish that he was entitled to receive IPI Criminal 4th No. 501B(2) in the absence of the jury's request or that trial counsel's failure to request it amounted to deficient performance. Defendant cannot satisfy the first prong of *Strickland*, therefore his claim of ineffectiveness of trial counsel fails.

¶ 96                                    D. Failure to Preserve DCFS Records

¶ 97          Prior to trial, defense counsel subpoenaed DCFS records concerning V.O. being removed from Laura's home in 2014. The original trial judge reviewed the records *in camera*, determined that they were irrelevant to the proceedings, and did not disclose them to the parties. The judge ordered that the records be impounded by the clerk of the circuit court for appellate review if necessary. Defendant argued in his motion for new trial that the trial court erred by not disclosing the records.

¶ 98          During the pendency of this appeal, it was discovered that the records were not retained. In response, this court directed that the DCFS records be resubpoenaed from DCFS for our review. However, DCFS was unable to locate any records for the relevant time period.

¶ 99          As a result, defendant contends that this court should remand his case for a new trial because the clerk of the circuit court's failure to preserve the sealed DCFS records denied him his fundamental right to appeal the court's decision not to release those records to the parties in discovery. He argues that a defendant has the right to have counsel examine otherwise statutorily privileged information if that evidence is relevant and impeaching.

¶ 100         As an initial matter, we note that when the defendant is the party appealing, it is his duty to present an adequate record from which to review any claims of error. *People v. Appelgren*, 377 Ill. App. 3d 137, 140 (2007). The record consists of the common law record, the report of proceedings, and the trial exhibits. *Id.* In this case, the DCFS records would be considered part of the common law record. As noted above, the records are missing and efforts to duplicate them, despite much effort, has been unsuccessful.

¶ 101         This court reviewed the two-pronged approach announced in *People v. Stark*, 33 Ill. 2d 616 (1966), for assessing whether a missing record deprives a litigant of meaningful review. *Appelgren*, 377 Ill. App. 3d at 141. Under that approach, the reviewing court must assess who is at fault for the absence of a complete record, and the reviewing court must assess whether its ability to adequately review the issues before it has been affected by the missing portion of the record. *Id.* This court also reviewed *People v. Seals*, 14 Ill. App. 3d 413 (1973), and *People v. Ramos*, 295 Ill. App. 3d 522 (1998), both of which examined and expanded the *Stark* approach. *Appelgren*, 377 Ill. App. 3d at 140-42. We determined that the defendant is obligated to provide a sufficiently complete record for appellate review; however, this rule will be relaxed where the incomplete record results through no fault of defendant and the defendant has established a colorable need for the missing portion of the record in order to obtain appellate review. *Id.* at 142-43.

¶ 102         Here, we find that neither defendant nor the State are at fault for the missing portion of the record. The record reflects that the trial court ordered the records to be sealed and impounded for preservation pending appellate review. Through no fault of the parties, that order was not complied with by the clerk of the circuit court. Accordingly, we find that defendant has established that he is not at fault for the missing records.

¶ 103         Next, defendant must show a colorable need for the missing record in order to receive meaningful review of the errors at issue. *Id.* (citing *Ramos*, 295 Ill. App. 3d at 526-27). Here, defendant is contending that he is being denied his fundamental right to appeal the court's decision not to release those records to the parties in discovery. We disagree.

¶ 104         When confidential records are sought in discovery, the trial court should review the records *in camera* and use its discretion to disclose only material information. *People v. Porter-Boens*,

2013 IL App (1st) 111074, ¶ 7. Any immaterial records shall remain undisclosed. *Id.* The trial court has broad discretion in ruling on issues of relevance and materiality, and its determination will not be disturbed absent an abuse of discretion. *Id.* ¶ 9. A claim that the trial court erred in limiting discovery will be reviewed for an abuse of discretion. *Id.*

¶ 105    Defendant has not cited, nor have we found, any case where a testifying witness's statutorily privileged DCFS records have been discoverable for impeachment purposes. Our research has however yielded cases discussing confidential reports of complaints against a police officer (see, *e.g.*, *Porter-Boens*, 2013 IL App (1st) 111074) and disclosure of mental health records (see, *e.g.*, *People v. McMillan*, 239 Ill. App. 3d 467 (1993)). In both cases, this court held that defendant must make a sufficient showing that the information contained in the records was relevant to the witness's credibility as a witness. *Porter-Boens*, 2013 IL App (1st) 111074, ¶¶ 11-18; *McMillan*, 239 Ill. App. 3d at 488. The same result is required here.

¶ 106    The confidential records defendant sought for discovery were DCFS records concerning V.O.'s removal from Laura's home in 2014, which is after the events that gave rise to this case. Evidence establishing that V.O. was no longer under Laura's care and had been adopted by her sister was presented at trial in both the State's case and in defendant's case. Additionally, evidence of Laura's prior drug use was introduced by the State and the defense. Moreover, defendant has not shown how the information contained in the DCFS records was relevant to either Laura's or V.O.'s credibility as witnesses. We fail to see what additional information the DCFS records themselves could have provided that was not already admitted into evidence and used for impeachment by defendant. Evidence used to impeach must raise an inference that the witness has something to gain or lose by his testimony; the evidence must not be remote or uncertain. *Porter-Boens*, 2013 IL App (1st) 111074, ¶ 11. No such showing has been made here; thus, the trial court did not err in denying discovery of the DCFS records to defendant. We therefore conclude that defendant was not denied his fundamental right to appeal the trial court's discovery decision.

¶ 107                                   E. Sentencing Errors

¶ 108    Finally, defendant contends that the trial court erred by sentencing defendant to 24 years' imprisonment after placing great weight on two improper factors in aggravation. Specifically, defendant notes the trial court's finding that the PSI contained two different dates of birth for him, implying it was a result of deception (without supporting evidence) rather than just a clerical error. Second, defendant notes that the court found it "very significant" that the current offense, like his prior voluntary manslaughter, occurred on a holiday and stated (without supporting evidence) that it was no coincidence and showed that he perhaps drank and got wild on holidays.

¶ 109    As a preliminary matter, we note that neither of the complained-of comments were objected to during defendant's sentencing hearing. While his motion to reconsider sentence states that the court improperly considered the date of birth information as an aggravating factor, it fails to raise an issue concerning the trial court's comments about the offenses occurring on holidays. Additionally, these issues were not raised at the hearing on the motion to reconsider sentence. Review of alleged sentencing errors is forfeited if there is no contemporaneous objection at the sentencing hearing and the issues are not included in a posttrial motion. *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010); *People v. Kitch*, 392 Ill. App. 3d 108, 118 (2009). Accordingly, we must find that review of the alleged sentencing error is forfeited.

¶ 110 Defendant also fails to request that this court review the trial court's rulings for plain error. The plain-error doctrine allows a reviewing court to reach an unpreserved error when either (1) the evidence in the case is closely balanced, regardless of the seriousness of the error, or (2) the error is so serious that the defendant was denied a substantial right, regardless of the closeness of the evidence. *People v. Taylor*, 409 Ill. App. 3d 881, 912 (2011). When a defendant fails to request this court to review a claim under plain error, he again forfeits the issue. *Id.* As defendant has not asked this court to review this issue under plain error, the procedural forfeiture will stand, and we will not consider this issue. See *Hillier*, 237 Ill. 2d at 545-46.

¶ 111 Defendant alternately contends that his 24-year Class X sentence is excessive because he was 45 years old and had committed no offense in more than 20 years. He argues that the trial court abused its discretion in sentencing him because, although second degree murder is "an undeniably serious offense," his conduct did not justify a sentence four times the Class X minimum. Defendant claims that this is shown by the trial court's own findings as well as the significant mitigation evidence. He further contends that no penological interest justifies his 24-year sentence and that this court should reduce his sentence or remand for resentencing.

¶ 112 It is well established that a trial court has broad discretionary authority in sentencing a criminal defendant. *People v. Evans*, 373 Ill. App. 3d 948, 967 (2007). An appellate court typically shows great deference to a trial court's sentencing decision since the trial court is in a better position to decide the appropriate sentence. *Id.* Accordingly, a trial court's sentencing decision is not overturned absent an abuse of discretion. *Id.*; *People v. Cunningham*, 2018 IL App (4th) 150395, ¶ 48. A sentence within the statutory range will not be deemed excessive and will not be disturbed unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Cunningham*, 2018 IL App (4th) 150395, ¶ 48.

¶ 113 The Illinois Constitution provides that penalties are to be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Perruquet*, 68 Ill. 2d 149, 154-55 (1977). This mandate calls for balancing the retributive and rehabilitative purposes of punishment, and the process requires careful consideration of all factors in aggravation and mitigation. *Evans*, 373 Ill. App. 3d at 967. This includes defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age, as well as the nature and circumstances of the crime. *Id.* To be sure, the most important factor a court considers is the seriousness of the offense. *Id.* at 968. Further, the trial court is not required to detail precisely for the record the process by which it determined a sentence nor is it required to make express findings as to a defendant's rehabilitative potential. *Id.*

¶ 114 Second degree murder is a Class 1 felony. 720 ILCS 5/9-2(d) (West 2012). However, defendant was sentenced under the Class X recidivist provision, which imposes mandatory Class X sentencing status upon defendants who are convicted of a Class 1 or Class 2 felony and who have at least two prior convictions classified as Class 2 or greater felonies, which he does not contest. 730 ILCS 5/5-4.5-95(b) (West 2012). A Class X sentence ranges from 6 to 30 years. See *id.* § 5-4.5-25(a).

¶ 115 Here, defendant was sentenced to a 24-year prison term, which as he argues on appeal, is four times the minimum Class X sentence. As noted above, the State presented evidence in aggravation, including defendant's prior convictions for possession of a stolen motor vehicle

and voluntary manslaughter committed while he was on felony probation for the manufacture and delivery of a controlled substance. Additionally, the State argued the statutory aggravation factors under section 5-5-3.2: defendant's conduct caused or threatened serious bodily harm, history of prior delinquency or criminal activity, and the necessity of the sentence to deter others from committing the same crime. *Id.* § 5-5-3.2(a)(1), (3), (7). The defense presented mitigating evidence in the form of several letters from defendant's family and people in the community regarding his character. This was in addition to evidence of defendant's activities post incarceration, including the various educational and other programs that he became involved in.

¶ 116 In sentencing, the trial court was not required to give defendant's mitigation evidence more weight than the seriousness of the crime itself. Therefore, the trial court noted both defendant's mitigation evidence as well as the aggravation evidence, specifically the prior voluntary manslaughter and the similarities between it and the current offense. The trial court also noted the evidence presented at trial by both sides and the seriousness of the crime itself, which resulted in the death of the victim. Thus, the trial court concluded that neither the minimum nor maximum sentences were appropriate and subsequently sentenced defendant to a 24-year prison term. As such, based on the circumstances of the case before us, we do not find the sentence to be excessive nor is it an abuse of the trial court's considerable discretion in sentencing.

¶ 117                                                    CONCLUSION

¶ 118 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 119 Affirmed.