2025 IL App (1st) 240179-U
No. 1-24-0179
Order filed June 12, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 10449 |
| | ) | |
| RAYMUNDO MEDINA, | ) | Honorable |
| | ) | Steven J. Rosenblum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for stalking over his contention that the State failed to prove his guilt beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Raymundo Medina was convicted of stalking and aggravated assault and sentenced to 240 days in the Cook County Department of Corrections and 2 years' probation. On appeal, he argues the State failed to prove his guilt of stalking beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3    Defendant was charged by indictment with two counts of stalking Perla Ruiz (Ruiz). The indictment alleged he parked outside her home, followed her in his vehicle, and rammed her

vehicle with his vehicle, and he knew or should have known that his course of conduct would cause a reasonable person to fear for her safety (count I) or suffer emotional distress (count II) (720 ILCS 5/12-7.3(a)(1), (2) (West 2022)). He was also charged with aggravated assault (720 ILCS 5/12-2(c)(7) (West 2022)) for operating a motor vehicle in a manner which placed Ruiz in reasonable apprehension of being struck by a moving vehicle.

¶ 4      At trial, Ruiz testified that she had an eight-year-old daughter and a three-year-old son. She dated defendant for about two years, beginning when her son was three months old. They lived together for about two months beginning in March 2022, and by June 2022, she and her children moved in with her mother. They maintained contact to see if their relationship could work and were "indecisive" about dating each other. She agreed they "were not together, but [they] were not apart." She denied that, during this time, defendant was living in his vehicle.

¶ 5      On the evening of Friday, August 12, 2022, she invited defendant to her mother's home. He arrived looking intoxicated and smelling of alcohol. Defendant accused her of "cheating" or "talking to someone else." She nevertheless told him to stay and eat dinner with them. Defendant did not want to stay and he left.

¶ 6      The next day, Saturday, August 13, she learned that defendant had gone to a party, which bothered her as he had wanted her to be "a prisoner at [her] mom's house" while he enjoyed himself. Ruiz initially testified that, on that day, defendant called her and she told him that they were "done." However, she later testified that she called and broke up with defendant either Friday night or Saturday morning, but she was "not really sure" which one. It was Saturday when she became certain their relationship would not work.

¶ 7    Around 8 p.m., she went out for drinks with her friend "Celene." Her children remained at her mother's home. While she was out, her mother and sisters called her multiple times and told her defendant was parked in front of her mother's house. She stayed at Celene's home and did not go home for fear that defendant was upset over the breakup and that she had been out.

¶ 8    On Sunday, August 14, defendant called and texted her through Facebook. She identified screenshots of missed calls and messages from defendant spanning August 14 and 15. The screenshots are included in the record on appeal and show over 100 missed calls from "Ray," whom Ruiz identified as defendant, between 5:11 a.m. on "Sun" and 6:40 a.m. the following day, and 2 answered calls at 6:12 a.m. and 6:27 a.m. the following day, which lasted about 2½ and 4½ minutes, respectively.

¶ 9    The screenshots further show that, between 3:15 p.m. and 10:45 p.m., on "Sun", defendant sent Ruiz the following text messages:

"Can't blame me now"

"Fake"

"Scary a**"

"It's about to get crazy"

"Answer the f*** phone!!!"

"Yo b***"

"You need to answer"

"Somebody scared lol"

"We haven't even spoke to one another"

"You are steady ignoring [me]"

"I am gonna give this up even tho I love you"

"I've been calling you for hours"

"F*** celene"

"Your kids miss you"

"Lmaooo"

"I know where you at"

"Who [the f***] you talking to"

"Answer the f*** [phone]"

"Why [the f***] aren't you answering I haven't done anything to you"

"Who [the f***] are you talking to"

"I'm done f*** you"

"W[h]at are we then"

"Your [*sic*] my woman [the f***] you thought"

"Where did I go wrong with you I only show you love"

"[Ruiz] answer me w[h]at did I do to you I just love you"

"You was f*** around or something?"

"Because I haven't done anything to you"

¶ 10    Ruiz testified that "lol" means "[l]augh out loud."

¶ 11    Around 11 p.m. on Sunday, August 14, 2022, she drove home to her mother's house. She saw defendant parked in front of the house. She waited in her vehicle until her sister ran out to

meet her. Her sister told her that defendant was sleeping in his vehicle, and they ran inside the house.

¶ 12    Around 5:40 a.m. the following morning, Monday, August 15, 2022, she saw defendant parked outside the house. She planned to take her son to daycare and go to work. She asked her mother to walk her to her vehicle. When they went outside, with Ruiz carrying her son, defendant approached, "[s]creaming," asking why she had not answered his phone calls or told him her location. She "got scared" and told defendant that they were no longer together. Defendant reentered his vehicle and started circling the block. She was afraid to take her son to daycare and decided to leave him with her mother. She waited until defendant was gone so that she could safely drive to work.

¶ 13    The house had surveillance cameras, and the State published a clip of footage which Ruiz testified depicted her interaction with defendant that Monday morning, defendant driving away and returning and briefly approaching the house before driving away again, and her leaving for work. Ruiz agreed that the video depicted her "back[ing] up" when defendant approached yelling at her. The footage is included in the record on appeal and is consistent with Ruiz's testimony.

¶ 14    Ruiz further testified that she drove an alternate route to work that morning to prevent defendant from following her. However, as she drove, she saw through the rearview mirror defendant following directly behind her. She stopped at a red light, and defendant began "hitting [her] car from behind" and "pushing" her into traffic. She called her mother and asked her to call the police. When the light turned green, she began to drive. Defendant continued hitting her vehicle from behind and from the passenger's side, telling her through their open windows to pull over to talk. She responded that she could not stop in the road to talk to him. He threatened to "flip" her

vehicle if she did not stop. She made a turn and saw a police vehicle activate its lights and approach when they stopped at another red light. She spoke with the officer and showed him the missed calls and messages from defendant. The officer arrested defendant.

¶ 15    Ruiz identified a photograph of her vehicle, a white SUV or truck, depicting damage to the rear bumper where defendant had pushed her vehicle from behind. She testified that her vehicle was undamaged where he hit her on the passenger's side. She further identified photographs of defendant's vehicle, a green SUV or truck, depicting damage on the front bumper and side from hitting her vehicle. According to Ruiz, the photographs of defendant's vehicle also depicted some preexisting damage. The photographs are included in the record on appeal and depict dents on the back bumper of Ruiz's vehicle; a large dent, scratches, and rust on the passenger side of defendant's vehicle; that defendant's front bumper was dented and dislodged; and scratches and dents to defendant's front license plate, which is hanging off the bumper from one of two screws that appear to have affixed it to the vehicle.

¶ 16    Ruiz's mother, Maria DeJesus Ruiz (Maria), testified that the cameras on her home were continuously recording from August 13 through 15, 2022. She identified clips from the footage that the State published at trial.

¶ 17    Maria testified that the clips depicted defendant's vehicle arriving and parking in front of her house at 10:43 p.m. on Saturday, August 13, 2022. At 4:39 a.m. on August 14, 2022, the vehicle was parked outside the house, and at 4:51 a.m., it drove away. At 1:46 p.m., defendant's vehicle returned, parked again, and was still there at 4:47 p.m. At that time, she and her other daughters approached defendant's vehicle but could not see through its tinted windows. They knocked on a window and no one exited. At 5:25 p.m., she exited her home and the vehicle drove away.

Defendant's vehicle returned and parked in front of the house at 9:21 p.m. It returned again at 2:47 a.m. on August 15, 2022, and left at 2:56 a.m. At 5:47 a.m., defendant's vehicle was parked one vehicle behind Ruiz's vehicle. Defendant left at 5:52 a.m., after she and Ruiz approached Ruiz's vehicle. At no time depicted in the clips had she or, to her recollection, Ruiz invited defendant over. Defendant never approached or made "threatening movements towards her house." The video clips are included in the record on appeal and are consistent with Maria's testimony regarding defendant's arrival and departure in front of her house.

¶ 18    Forest View police officer Jesus Carrillo Jr. testified that, around 6:37 a.m. on August 15, 2022, he saw two vehicles turning, with a green SUV attempting to "aggressive[ly]" pass a white SUV. After the vehicles passed him, Carrillo saw in his driver's side mirror that the green SUV's brake lights were turning on and off, and the back of the vehicle was "aggressive[ly]" bouncing as it inched forward towards the white SUV. Carrillo made a U-turn, exited his vehicle, and approached the green SUV's driver, whom he identified in court as defendant. He asked defendant to "knock it off." The driver of the white SUV then exited her vehicle and, distraught, told Carrillo that defendant was chasing and ramming her vehicle.

¶ 19    Carrillo detained defendant, transported him to the police station, and informed him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). When asked what had happened that morning, defendant said, "you caught me red-handed." Defendant also stated that, on Friday, he had dropped off his girlfriend at her house, where he returned on Saturday, Sunday, and Monday.

¶ 20    Defendant testified that, in August 2022, he was living in his vehicle after he had to give up his apartment when Ruiz moved out. "[A]s far as [he] knew," he and Ruiz had remained in a

relationship after she moved out. A "couple" days per week, he would park outside her family's house and sleep.

¶ 21    On Friday, August 12, 2022, Ruiz's family invited him to dinner. They ate together and then Maria sent defendant to the store. When he returned, Ruiz was gone. He stayed in his vehicle. Ruiz never called to break up with him. He started calling her the morning of Saturday, August 13, 2022, and she never answered. He parked outside the home waiting for her all Saturday, Sunday, and Monday. No one told him to move his vehicle.

¶ 22    Defendant further testified that his messages to Ruiz, "Scary a**," and "It's about to get crazy," meant that he was upset. He agreed his message "Somebody scared lol" might have referred to Ruiz. He did not recall whether he was outside the home when he texted her "Your kids miss you," and "Lmaooo," but thought the children were at her mother's house.

¶ 23    The morning of August 15, 2022, he saw Ruiz leaving the home. He tried to talk to her and ask where she had been. He agreed that she "back[ed] up" when he approached. She said she did not want to talk to him at that moment, and he entered his vehicle and drove away. He did not recall whether he returned. He went to get breakfast at a McDonald's and saw Ruiz's vehicle. Defendant acknowledged that there were "[p]robably" other McDonald's between the home and where he later saw Ruiz that he did not go to. He attempted to talk to her and followed her. He denied ramming her vehicle and that their vehicles touched. The damage to their vehicles that Ruiz had identified existed prior to August 15, 2022. The license plate was damaged when he affixed it to the vehicle, which he had owned for about a year. He acknowledged he told Carrillo he had caught him "red-handed." Defendant explained he meant that Carrillo had caught him "red-handed" trying to talk to his girlfriend.

¶ 24    Following argument, the court found defendant guilty of aggravated assault and both counts of stalking. The court stated that the case turned on the witnesses' credibility and found defendant incredible. The court explained that defendant "was doing everything he can" to intimidate Ruiz, and scare her and everyone in the house. The photographs of Ruiz and defendant's vehicles showed rust in certain spots from preexisting damage, but no rust appeared on the metal front bumper of defendant's vehicle or the back bumper of Ruiz's vehicle, indicating that damage was new. The court did not believe that defendant would have left his license plate "mangled" and "half falling off" for a year, as he testified. The court further remarked that defendant's text "Lmaooo" indicated defendant was "laugh[ing] [his] a** off." The court noted that defendant's parking outside of the house constituted "direct intentional actions" to stalk Ruiz and found the evidence "overwhelming."

¶ 25    The court denied defendant's motion to reconsider or for a new trial. Following a sentencing hearing, the court merged the stalking counts into count I predicated on defendant knowing his course of conduct would cause a reasonable person to fear for her safety. According to the sentencing order, the court imposed concurrent terms of 240 days in jail and 2 years' probation for stalking (Count I only) and aggravated assault, with anger management counseling and no contact with Ruiz. The court also entered a plenary order of protection for Ruiz that extended two years past the end of defendant's probation.

¶ 26    On appeal, defendant argues that the State failed to prove his guilt of stalking beyond a reasonable doubt. He does not challenge his aggravated assault conviction.

¶ 27    "When reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. We must view the evidence in the light most favorable to the State and allow all reasonable inferences in the State's favor. *Id.* It is the factfinder's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences, and we will not substitute our judgment for the factfinder's on questions involving the weight of the evidence or the witnesses' credibility. *People v. Galarza*, 2023 IL 127678, ¶¶ 25-26. The factfinder need not disregard inferences flowing normally from the evidence or raise "all possible explanations consistent with innocence" to the level of reasonable doubt. (Internal quotation marks omitted.) *Id.* ¶ 25. We will only reverse a conviction if the evidence "is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Id.* ¶ 26.

¶ 28    Defendant was found guilty and sentenced on count I, which charged him with stalking predicated on causing a reasonable person to fear for her safety, pursuant to section 12-7.3(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-7.3(a)(1) (West 2022)). The parties agree that count II, predicated on causing a reasonable person to suffer emotional distress (*id.* § 12-7.3(a)(2)), is not at issue.

¶ 29    Section 12-7.3(a)(1) of the Code provides:

"(a) A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:

(1) fear for his or her safety or the safety of a third person[.]" *Id.* § 12-7.3(a)(1).

¶ 30    A reasonable person is "a person in the victim's situation." *Id.* § 12-7.3(c)(8). A course of conduct consists of multiple acts, such as surveilling, following, or threatening a person, and

interfering with or damaging a person's property. *Id.* § 12-7.3(c)(1). Defendant acknowledges that he engaged in a course of conduct when he "stay[ed] outside [Ruiz's] home for three days, called her over and over, confronted her outside her house, and then followed her to work."

¶ 31    Defendant argues that the State failed to prove that he knew or reasonably should have known that his actions would cause a reasonable person in Ruiz's position to fear for her safety.

¶ 32    A person acts knowingly regarding the result of his conduct if he "is consciously aware that that result is practically certain to be caused by his conduct." *Id*. § 4-5(b). The phrase "should have known" "implicates the standard of care which a reasonable person would exercise," and relates to the mental states of recklessness and negligence. (Internal quotation marks omitted.) *People v. Trajano*, 2018 IL App (2d) 160322, ¶ 25. A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur, and negligently when he fails to be aware of a substantial and unjustifiable risk that a result will occur. 720 ILCS 5/4-6, 4-7 (West 2022). Whether a defendant had a particular mental state is best left to the trier of fact and "may be inferred from the character of the defendant's acts" and surrounding circumstances. *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 69.

¶ 33    Here, Ruiz testified that she broke up with defendant over the phone on either the night of Friday, August 12, 2022, or the morning of Saturday, August 13, 2022. The video clips that Maria identified show that, beginning Saturday night, defendant started parking outside the family's home. After going out with her friend Saturday night, she did not return home until about 11 p.m. on Sunday out of fear of defendant.

¶ 34    The screenshots of calls and messages sent show that, as of Sunday morning, defendant was calling Ruiz incessantly, and messaged her, "Scary a**," "It's about to get crazy," and

- 11 -

"Somebody scared lol." He messaged that her children, who remained in the home, missed her, followed by "Lmaooo," which the trial court noted meant he was "laugh[ing] [his] a** off." Defendant remained parked outside the home intermittently from Saturday night until Monday morning, when Ruiz had to go to work. As she carried her son to her vehicle to take him to daycare, defendant approached, screaming at her. He acknowledged that Ruiz "back[ed] up" when he approached her and did not want to talk to him at that moment. She testified that as she drove to work, he began following her and ramming her vehicle with his vehicle, threatening to flip her vehicle over. When Officer Carrillo asked defendant what happened, defendant stated that Carrillo had caught him "red-handed."

¶ 35    Viewing the evidence in the light most favorable to the State, a rational trier of fact could conclude that defendant knew or should have known that his course of conduct would cause a reasonable person in Ruiz's position to fear for her safety. His messages to Ruiz that things were about to get "crazy," followed by references to someone was scared and the fact that her children were home without her and indications that he found the situation humorous, permit a rational trier of fact to reasonably infer that defendant knew, or at least should have known, that Ruiz feared him. Moreover, he does not dispute on appeal that his course of conduct culminated in his following Ruiz's vehicle and intentionally hitting her vehicle with his vehicle while threatening to flip her vehicle, which anyone would or should know would cause the driver of the other vehicle to fear for her safety. We therefore conclude that the State established the contested knowledge element beyond a reasonable doubt.

¶ 36    Nevertheless, defendant argues he did not know and reasonably could not have known that his conduct would cause Ruiz to fear for her safety as he believed they were still dating when he

underwent the above course of conduct. Additionally, as Ruiz did not answer his phone calls and text messages, he contends he could not have known that her fear of him was the reason she did not go home until late Sunday night. He notes that Ruiz testified initially that she broke up with him on Saturday, then that it was either Friday night or Saturday morning, and the State did not introduce evidence proving that they spoke over the phone on Friday or Saturday to show that they were no longer dating. Further, defendant testified that she did not break up with him, and some of his text messages indicate that he believed they were still together or was unsure of their relationship status. He also claims that, as there was no evidence establishing how defendant and Ruiz communicated throughout their entire relationship, his conduct on the days at issue "could have been par for the course."

¶ 37 However, defendant admits that if he knew his and Ruiz's relationship was over, "the reasonable inference is that [Ruiz] wanted nothing to do with him, so his conduct of waiting outside her house, incessantly attempting to contact her, and following her to work could only be for the purpose of scaring or intimidating her."

¶ 38 A rational factfinder could conclude that defendant knew the relationship had ended. Ruiz testified that she told defendant their relationship was over, and the State did not need to produce evidence, *e.g.*, screenshots, proving they spoke over the phone to establish that fact. See *People v. Hill*, 2023 IL App (1st) 150396, ¶ 23 (forensic evidence is unnecessary and the testimony of a single witness may suffice for a conviction). The trial court, as finder of fact, was entitled to believe Ruiz's testimony and disbelieve defendant's testimony that she had not broken up with him. See *Galarza*, 2023 IL 127678, ¶ 25 (in a bench trial, it is trial court's province to determine the credibility of testimony). Defendant's argument to the contrary is a request to substitute our

judgment for the trial court's on the credibility of the witnesses, which we will not do. *Id.* ¶ 26. Although defendant contends that he is not challenging the credibility of witnesses but noting inconsistencies in the testimonies, it still remains the trier of fact's function to resolve any inconsistencies in the testimony. *Id.* ¶ 25.

¶ 39    Additionally, we are not convinced that whether Ruiz had clearly broken up with defendant is the determinative fact in this case, as defendant asserts. Defendant called Ruiz more than 100 times in a roughly 24-hour period, spent significant time parked outside her family's home though uninvited, sent her messages implying he knew she was scared and referencing her children that were inside the home, yelled at her while she held her child, followed her on her way to work, and hit her vehicle multiple times while threatening to flip her vehicle. Even if he did not know Ruiz had permanently ended their relationship, a rational factfinder could conclude from the character of his actions that he knew or reasonably should have known his course of conduct would make a reasonable person in Ruiz's position fear for her safety. See *Elizondo*, 2021 IL App (1st) 161699, ¶ 69.

¶ 40    Accordingly, we find the evidence sufficed to prove defendant's guilt of stalking beyond a reasonable doubt. We therefore affirm the judgment of the circuit court of Cook County.

¶ 41    Affirmed.